106 So.2d 416 (1958)
Harley A. CONNER, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
November 12, 1958.
*417 C.A. Avriett, Jasper, for appellant.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
O'CONNELL, Justice.
Defendant, Harley A. Conner, was indicted for the murder in the first degree of Mark Read, Sheriff of Gilchrist County, Florida. He plead not guilty and not guilty by reason of insanity. The jury returned a verdict finding him guilty of murder in the first degree with no recommendation of mercy. Defendant's motion for new trial was denied. He then entered his appeal from the judgment and sentence of the court.
Defendant lived alone in a country home which was within sight of the home of his son, Edward Conner. On the day of the homicide Edward Conner and his brother-in-law, Claude L. Rodgers, went hunting. When they returned to Edward Conner's home the defendant was there. Edward Conner and his father, the defendant, got into an argument over defendant's driving Edward's truck while the defendant was drinking. Defendant left and went to his house but returned shortly in the truck and with a shotgun. There were indications that defendant had been drinking. Rodgers, defendant's son-in-law, tried unsuccessfully to get the gun away from the defendant. Defendant then drove back home, after telling Rodgers that he could follow him in his car and get the gun upon arriving at defendant's house. However, when they got to defendant's house the defendant refused to give the gun to Rodgers and pointed it at him, telling him to leave him alone. Rodgers thereupon left, after warning the defendant that if he did not give him the gun he would get the Sheriff to come get it.
Rodgers and Edward Conner then drove into Trenton, the County seat, where they discussed the matter with the Sheriff, Mr. Mark Read, and asked him to come take the gun away from the defendant. Conner and Rodgers returned to Conner's home and they, with their wives and children, then went to the home of Leonard Conner, another son of the defendant. Leonard's home was also near the home of the defendant.
*418 The defendant went to Leonard's house and Leonard informed him that the Sheriff was coming and asked his father to give the gun to the Sheriff when he arrived. The defendant returned to his home and subsequently the Sheriff came to Leonard's house and asked for more information relative to the incident. The Sheriff then left for the defendant's house.
While Edward Conner, Claude Rodgers and their families were all at Leonard Conner's house a shot was heard from the direction of the defendant's house. Leonard drove to defendant's house in his car. He discovered the Sheriff's car parked about 100 yards beyond his father's house and saw another car drive up and stop by the Sheriff's. The occupants of the car got out and Leonard came up also. They discovered the Sheriff sitting behind the wheel of his car bleeding badly and trying to call over his radio. The Sheriff told them the defendant had shot him. Leonard asked where his father was and the Sheriff replied he was up at his house but to leave him alone, as he might shoot Leonard also. Leonard thereupon returned home while the others drove the Sheriff into town for medical aid.
Defendant walked over to Leonard's house, carrying his shotgun. Leonard related that defendant first told him that he did not shoot the Sheriff, then that he did shoot him, and then on several occasions that he did not shoot him. Leonard said the defendant staggered and fell three times as he approached his house and that he assisted him into the house, where the arresting officers subsequently found him
The Sheriff was transferred into an ambulance and rushed to a hospital in Gainesville. He told the ambulance driver that the defendant shot him. The physician attending him in the hospital also asked who had shot him and the Sheriff told him defendant had. A law enforcement officer was present and heard the Sheriff's remarks. The doctor asked the Sheriff if he had seen defendant shoot him and the Sheriff said he had not, but thought defendant fired the gun from a window or door of his home.
The Sheriff remained conscious some 45 minutes after arriving at the hospital and died approximately three hours after being shot.
Defendant testified in his defense and related he had been drinking all day the day before the shooting and had drunk about a half pint prior to the argument with his son the morning of the shooting. He recalled in detail some of the events both prior and subsequent to the shooting but could recall nothing about the actual shooting. He asserted that he either did not shoot the Sheriff or that if he did he did not know it.
Defendant's principal contention is that the State failed to prove any specific intent on his part to kill the Sheriff. In addition he argues that the evidence shows him to have been in such a drunken state that he could not have entertained a premeditated design to kill anyone.
All witnesses who were asked testified that they did not see the defendant actually take a drink on the day of the shooting. His sons and son-in-law testified that they knew he had been drinking. Rodgers said he appeared to be in somewhat of a drunken stupor and Leonard Conner stated he saw him stagger and fall three times as he approached his house after the shooting. Investigating officers related that they smelled alcohol on his breath but did not deem him so intoxicated that, had they observed him on the city streets, they would have arrested him.
By defendant's own testimony he did not drink over a pint of whiskey on the day of the killing. He stated that he had drunk about one-half a pint from a full pint bottle prior to his argument with his son, which occurred near the noon hour, and did not remember drinking any more. The shooting occurred early in the afternoon. Although he contends he cannot recall the actual shooting, defendant did *419 recall many of the details of the events of the day. In addition, the testimony of various witnesses as to defendant's actions, speech and demeanor indicate that defendant was not intoxicated to the extent that he was incapable of forming the intent to kill. The jury was adequately instructed by the court as to the relevancy of intoxication to premeditation. We conclude that the jury was warranted in determining from the evidence that the defendant was not so intoxicated at the time of the shooting that he could not have entertained a premeditated design to kill.
We note here that although the defendant plead not guilty by reason of insanity, he made no effort to prove this defense at the trial, nor does he argue the question on this appeal.
Further, as to defendant's contention that the State had failed to prove a specific intent on the part of the defendant to kill the deceased, the evidence shows that defendant was warned both by Rodgers, his son-in-law, and by Leonard, his son, that the Sheriff was coming to take the gun or guns from him. The confession, the sketch prepared by the officer and signed by defendant, the dying declarations of the Sheriff, all show that the defendant, in hiding, awaited the arrival of the Sheriff, and cut him down with a blast of buckshot. Eight of nine pellets in the shell hit the deceased.
In the confession, the defendant said he "was in a little group of small blackjack oak trees" across the road from his house when the Sheriff arrived; that the Sheriff walked across the front of the house; that the defendant called out to the Sheriff, "What do you want"; that the Sheriff answered, "I come after you"; and then "That's when I shot Mark."
There is nothing in the evidence in this cause to show or suggest that the Sheriff was killed in any manner except by the deliberate intended act of the defendant.
It is true that there is no direct evidence from the defendant that he had formed a premeditated design or intent to kill the Sheriff. But this is not necessary, for this element, as well as all others in a criminal charge, may be proved by circumstantial evidence. Crawford v. State, 1941, 146 Fla. 729, 1 So.2d 713. The test of the sufficiency of the circumstantial evidence is that it must not only be consistent with guilt but it must also be inconsistent with innocence. Cases cited in 13 Fla.Jur., Evidence, Sec. 417, p. 416 et seq.
In the case before us, when the defenses of insanity and intoxication are removed, the facts and circumstances point unerringly to the conclusion that the homicide was committed by the defendant and that it was done by premeditated design and intent. The facts and circumstances are not only consistent with the presence of premeditation, but are inconsistent with the absence thereof. They were sufficient to support the inference by the jury that the homicide was premeditated.
Defendant also contends that a written confession signed by him was not freely and voluntarily made.
Defendant was arrested and placed in the County Jail on December 9, 1956, the day of the murder. On December 11, 1956, he made and signed a confession. On the same day the defendant was taken by a group of law enforcement officers to the scene of the shooting. While there, the confession was read to him and he acknowledged in their presence that it had been freely and voluntarily given. While at the scene the defendant showed the officers the position of the Sheriff, the Sheriff's car, and himself at the time of the shooting. From this one of the officers made a sketch of the scene and on the next day defendant marked thereon the positions of the pertinent objects and persons and signed the sketch which was introduced in evidence.
At the trial, when the State sought to introduce the confession into evidence, the court examined the officer who took the confession. The court, being satisfied with *420 the voluntary and free nature of the confession, called in the jury, which had been absent from the courtroom. The officer was again questioned, in the presence of the jury, as to the circumstances surrounding the confession. Finally, in its charge to the jury the court instructed the jury that they should treat with particular caution a confession made by an accused after he had been incarcerated in jail.
Shortly after he was confined defendant's sons were also placed in the jail. Defendant asserts that he was coerced into signing the confession so that they might be liberated. We find no evidence whatsoever to support this assertion nor any other evidence to corroborate defendant's contention that the confession was not freely and voluntarily made. The fact that the interrogating officers were strangers to the defendant is of no significance, contrary to the contention of the defendant.
The only other point necessary to be discussed involves a tag attached to the shotgun, which gun was offered and received in evidence.
During the trial defendant's son-in-law, Claude Rodgers, called as a State witness, testified that the gun which defendant had with him on the fateful day had been loaned by him to the defendant. A shotgun was then presented to Rodgers and identified by him as the one he had loaned to the defendant. The State offered the gun into evidence and defendant's counsel objected. saying:
"Objected to, if your Honor please, until the corpus delicti has been proven and, second, until it is shown that gun had something to do with the killing of the deceased."
Upon the court overruling that objection, the defense counsel then objected that no proper predicate had been laid. The court adhered to its rule and the record reflects that the gun was passed to the jury for examination.
Later, when the defendant took the stand the prosecution, on cross examination, read to the defendant and court a tag which was attached to the gun. This tag read as follows:
"December 12, 1956. This is the gun I shot Mark Read with."
The tag was signed "Harley Austin Conner" and defendant acknowledged that the signature was his, although he testified that he had merely written on the tag what the officers told him to write.
After the tag had been read the defendant was questioned about it to some extent by the prosecution and the tag was then shown to the jury. At that point the defense counsel objected and the following colloquy took place:
"Mr. Avriett: If your Honor please, let the record show that the particular card has not been offered in evidence that is being demonstrated and the witness questioned about, but is being exhibited to the jury by the State Attorney.
"Mr. Duncan: It was all attached to the gun and you had opportunity to object to it and didn't.
"Mr. Avriett: The gun was introduced in evidence.
"Mr. Duncan: That's all."
In his confession, which we have ascertained to have been freely and voluntarily given, the defendant said:
"* * * I used the same shotgun that I had at Edward's house  the 12 gauge single barrell that I had borrowed from Claude."
The statement on the tag added no new incriminating evidence above what was contained in the confession. Assuming that it was error to exhibit the tag to the jury, it does not appear that the statements thereon could have resulted in prejudice to the defendant in view of the fact that the confession contained the statements above quoted. We are also of the opinion that other evidence and admissions of guilt are so prevalent that, even in the *421 absence of the confession, any alleged error in connection with the introduction of the gun and tag into evidence could not have "injuriously affected the substantial rights" of the defendant as contemplated by Sec. 924.33, F.S.A.
We have carefully examined and considered the record in the light of the briefs filed and have also, pursuant to subparagraph (2) of Sec. 924.32, F.S.A., reviewed the evidence to determine if the interest of justice requires a new trial, with the result that we find no reversible error is made to appear and the evidence does not reveal that the ends of justice require a new trial to be awarded.
Accordingly, the judgment and sentence of the lower court is hereby affirmed.
TERRELL, C.J., and HOBSON, DREW and THORNAL, JJ., concur.