466 So.2d 301 (1985)
Johnny L. JONES, Appellant,
v.
The STATE of Florida, Appellee.
No. 81-2176.
District Court of Appeal of Florida, Third District.
February 26, 1985.
Rehearing Denied April 12, 1985.
Frates, Bienstock & Sheehe and Terry Bienstock, Fletcher Baldwin, Gainesville, for appellant.
Jim Smith, Atty. Gen., Janet Reno, State Atty. and Ira N. Loewy, Asst. State Atty., for appellee.
Before SCHWARTZ, C.J., and BARKDULL, HENDRY, HUBBART, NESBITT, *302 BASKIN, DANIEL S. PEARSON and FERGUSON, JJ.[*]
SCHWARTZ, Chief Judge.
This is an appeal from a conviction for grand theft rendered after a jury trial. The cause was heard en banc because the proposed but unreleased panel opinion[1]  which is now the appendix to Judge Hubbart's dissent  demonstrated on its face a misapplication of and departure from the rules relating to the sufficiency of circumstantial evidence in criminal prosecutions which we previously announced in Hernandez v. State, 305 So.2d 211 (Fla. 3d DCA 1974), cert. denied, 315 So.2d 192 (Fla. 1975),[2]Knight v. State, 392 So.2d 337 (Fla. 3d DCA 1981), pet. for review denied, 399 So.2d 1143 (Fla. 1981),[3] and Pressley v. State, 395 So.2d 1175 (Fla. 3d DCA 1981), pet. for review denied, 407 So.2d 1105 (Fla. 1981).[4] See State v. Navarro, 464 So.2d 137 (Fla. 3d DCA, 1985). Applying those principles to the facts as very fairly and completely set forth by Judge Hubbart, we are convinced they are more than sufficient, indeed overwhelmingly so, to justify the trial court's action in submitting the cause for jury determination and the jury's consequent finding of the defendant's guilt. Accord, Lincoln v. State, 459 So.2d 1030 (Fla. 1984); Heiney v. State, 447 So.2d 210 (Fla. 1984); Rose v. State, 425 So.2d 521 (Fla. 1982), cert. denied, 460 U.S. 1049, 103 S.Ct. 1496, 75 L.Ed.2d 928 (1983); State v. Allen, 335 So.2d 823 (Fla. 1976). Hence, we reject the claim that the defendant is entitled to be discharged.
We do however reverse for a new trial on the authority of Neil v. State, 457 So.2d 481 (Fla. 1984), reversing Neil v. State, 433 So.2d 51 (Fla. 3d DCA 1983). There is no doubt that the record as to the state's use of its peremptory challenges to excuse black prospective jurors satisfied the Neil prerequisites for inquiry by the trial court into the basis of those challenges, which Jones requested but which was denied by the trial judge. And, notwithstanding the language in Neil concerning its general non-retroactivity, 457 So.2d at 488, it is also clear from the Supreme Court's subsequent reversal for a new trial on the basis of Neil in the identical case of Andrews v. State, 459 So.2d 1018 (Fla. 1984), reversing 438 So.2d 480 (Fla. 3d DCA 1983), that Neil governs so-called "pipeline" cases such as this one, in which *303 the issue was properly preserved below and which was pending when Neil was decided. City of Miami v. Cornett, 463 So.2d 399 (Fla. 3d DCA 1985); Safford v. State, 463 So.2d 378 (Fla. 3d DCA 1985); see also, e.g., Hoberman v. State, 400 So.2d 758 (Fla. 1981) (applying Sarmiento holding to pending appeal); Tascano v. State, 393 So.2d 540 (Fla. 1980).
There is no merit in the appellant's points II and IV challenging the admissibility of evidence. The other issues concern matters unlikely to affect or to arise at the new trial and therefore do not require treatment here.
Reversed and remanded for a new trial.
HUBBART, Judge (dissenting).
I must respectfully dissent. I would vacate the order setting this cause for an en banc hearing, as being unauthorized by Fla.R.App.P. 9.331, and would return this cause to the three-judge panel of this court which has already decided this case, so that the said panel may release its duly authorized opinion. The said panel opinion reverses the defendant Jones' conviction, finding insufficient evidence to convict, and remands with directions to discharge the defendant Jones from the cause. In my view, it is the only authorized opinion of the court in this cause.
A brief background of this case is in order. A three-judge panel of this court (Hubbart, Baskin, Ferguson, JJ.) has previously received briefs, heard oral argument and rendered a unanimous opinion reversing the defendant Jones' conviction for insufficient evidence. Prior to this opinion's final release, a majority of the court, not including the panel, determined to conduct a de novo en banc hearing in the cause and the panel opinion was, accordingly, not released. Subsequent thereto, additional briefs were ordered and an oral argument was held before the full court, although the parties were never informed of the court's basis for a de novo en banc hearing. Today's en banc decision is a result of this process.
I think the order setting this cause for an en banc hearing and the subsequent en banc proceedings conducted herein are unauthorized under Fla.R.App.P. 9.331. I reach this conclusion for three separate, independent reasons.
First, it is questionable, in my view, whether the order setting this cause for an en banc hearing was a collegial decision. The three-judge panel which decided this case played no real part in the decision to en banc this case; the en banc order and en banc proceedings have taken place on the informal vote of five judges of this court. Plainly, Fla.R.App.P. 9.331(a) contemplates collegial decisions on all en banc matters; in my view, it is dubious whether such has been accomplished in this case.
Second, I do not think the full court has the authority to order an en banc hearing after the issuance of a three-judge panel decision, but prior to its final release, as here, without the concurrence of at least two judges of the original panel. En banc hearings, as opposed to en banc rehearings, are not contemplated by Fla.R.App.P. 9.331 after a three-judge panel of the court has, in fact, decided the case unless a majority of the original panel request the en banc hearing as, for example, for the purpose of overruling a prior case of the same court. See In re Rule 9.331, 416 So.2d 1127, 1128 (Fla. 1982). It is urged, nonetheless, that the legal basis for an en banc hearing here is an asserted lack of uniformity, under Fla.R.App.P. 9.331, between the three-judge panel opinion and prior decisions of this court. It seems elementary, however, that no such lack of uniformity can possibly arise until the three-judge panel opinion has been publicly released and has become part of the law of this state. This has not been done in this case, and, accordingly, the de novo en banc proceedings are, in my view, unauthorized under Fla.R.App.P. 9.331.
In this connection, the court's reliance on Edge v. State, 455 So.2d 626 (Fla. 5th DCA *304 1984) and Royal v. State, 452 So.2d 1098 (Fla. 5th DCA 1984), as precedent for the en banc proceedings herein is, in my view, misplaced. 466 So.2d at 302 n. 1. In both of these cases, members of the three-judge panel itself appear to have voted for the en banc hearing and a unanimous panel opinion was never rendered. In re K.A.F., 442 So.2d 365 (Fla. 5th DCA 1983) and Torrence v. State, 440 So.2d 392 (Fla. 5th DCA 1983), on the other hand, seem more on point, although ultimately distinguishable. In these cases, an en banc hearing was held based on an alleged conflict between a proposed majority panel opinion and a prior Fifth District decision; unlike this case, however, one judge on the original panel was in dissent and apparently agreed to the en banc hearing. No panel opinion was actually ever rendered in view of the dissenting judge's position on the matter. So far as I am aware, the instant case is the first case in Florida where a district court of appeal has ordered an en banc hearing after a unanimous three-judge panel opinion has been rendered, but prior to its final release, without the consent of any member of the three-judge panel. Still, I recognize that K.A.F. and Torrence are somewhat at variance with my views on this issue, and, to that extent, I agree entirely with Judge Cowart's dissent in K.A.F.:
"Section 4(a), Art. V, of the Constitution of the State of Florida provides that in district courts of appeal `three judges shall consider each case and the concurrence of two shall be necessary to a decision.' That constitutional provision has absolutely no meaning if a majority of the judges on a district court of appeal, disagreeing with the view of some proposed panel majority decision, can, by merely claiming an en banc hearing is necessary to maintain uniformity in the court's decisions, act under Florida Appellate Rule 9.331 to wrestle jurisdiction of a particular case away from the panel to which it was assigned and decide it according to a different view of the law or facts and do this without the proposed panel majority opinion ever being published or the claimed conflict issue ever being briefed, argued or conferenced. This occurred the first time on this court in Torrence v. State, 440 So.2d 392 (Fla. 5th DCA 1983), and each instance needs to be noted for whatever value it may have and for consideration by anyone concerned with the constitutional problem involved in the present en banc rule as it is being used. As here and in Torrence en banc jurisdiction can be decisive in a particular case. En banc jurisdiction is important beyond the resolution of the particular case and its effect on the body of law. Its employment can constitute an end run around the constitution which is so effective as to be subject to no defense or review. I dissent from its use in this case."
442 So.2d at 369-70 (Cowart, J., dissenting).
Third, I see no lack of uniformity, in any event, between the three-judge panel opinion in this case and any prior decision of this court sufficient to trigger an en banc hearing under Fla.R.App.P. 9.331. The court asserts, in effect, such non-uniformity by claiming that the panel opinion demonstrates on its face "a misapplication of and departure from the rules relating to the sufficiency of circumstantial evidence in criminal prosecutions," and that the evidence adduced at trial, as set forth in the panel opinion, is "more than sufficient, indeed overwhelmingly so, to justify the trial court's action in submitting the cause for jury determination and the jury's consequent finding of the defendant's guilt." 466 So.2d at 302. The court, however, does not provide us with any analysis of the facts of this case and gives no indepth reasons as to why it reached these conclusions. In announcing its decision in such conclusory terms, the court speaks, in my view, with the voice of authority, but not with the voice of reason. By way of contrast, the three-judge panel opinion analyzes the facts and applicable law in this case in considerable depth and reaches a *305 reasoned, and I think, correct conclusion. To demonstrate the soundness of this position, the three-judge panel opinion is reproduced in its entirety in the appendix to this opinion. In my view, it is the only authorized decision of the court in this case.
For the above-stated reasons, I would vacate the order setting this case for an en banc hearing and return the cause to the three-judge panel in this case so that the said panel may release its duly authorized opinion.
BASKIN and FERGUSON, JJ., concur.

APPENDIX
Before HUBBART, BASKIN and FERGUSON, JJ.
HUBBART, Judge.
The controlling issue presented for review by this appeal is whether on this record the state established a prima facie case of second degree grand theft against the defendant sufficient to withstand timely defense motions for a judgment of acquittal at trial. For the reasons which follow, we conclude that the state failed to establish such a prima facie case. We, accordingly, reverse the judgment of conviction and sentence under review and remand with directions to discharge the defendant from the cause.

I
On February 23, 1980, the Dade County Grand Jury returned an indictment against the defendant Dr. Johnny L. Jones, the former superintendent of the Dade County public school system, for the crime of second degree grand theft [§ 812.014(1)(a), (b), (2)(b)1, Fla. Stat. 1979)]. Charged in the same indictment, but tried separately, was a co-defendant Solomon Barnes,[1] the former principal of Miami Douglas MacArthur South Senior High School ["MacArthur South"] in the Dade County public school system. The indictment, in relevant part, charged as follows:
"[B]eginning on the 22nd day of December, 1979, and continuing through the 1st day of February, 1980, within the County of Dade, State of Florida, SOLOMON BARNES and JOHNNY L. JONES, did knowingly, unlawfully and feloniously endeavor to obtain or to use bathroom and kitchen fixtures and fittings of the value of One Hundred Dollars ($100.00) or more, by ordering said fixtures and fittings from Bond Plumbing Company, of Dade County, Florida, and by endeavoring to cause said fixtures and fittings to be paid for by the School Board of Dade County, Florida, with the intent to permanently deprive the said School Board of Dade County, Florida, of a right to the said property or a benefit therefrom or to appropriate the same to their own use or to the use of a person not entitled thereto... ." (R.14)
The defendant Jones entered a plea of not guilty and was tried by a jury below. In a nutshell, the state's theory of guilt against the defendant Jones, as presented at trial, was as follows. Solomon Barnes, a Dade County high school principal, ordered a set of expensive plumbing fixtures, having a market value well in excess of $100, from a local plumbing firm for the alleged purpose of using the equipment in a plumbing class at the high school where he was the principal. This purpose, however, was only a ruse, as the real purpose for ordering the equipment was to turn it over to the defendant Johnny L. Jones, the Dade County Superintendent of Schools, for his personal use in building a vacation home in Naples, Florida. The defendant Jones, in turn, approved the order in question, expedited the processing of the order through *306 the school system, and was fully aware of its illegal purpose. This illegal scheme was eventually thwarted and the order was never filled after responsible school officials rescinded the order prior to delivery. It was therefore charged that the defendant Jones "endeavored" or attempted to commit a grand theft, which in itself is punishable as a second degree grand theft under Section 812.014(1)(a), (b), (2)(b)1, Florida Statutes (1979).
The defendant Jones, on the other hand, presented a theory of innocence at trial which differed sharply from the state's theory of guilt. The defendant Jones maintained that Solomon Barnes, with Jones' knowledge and approval, ordered the plumbing fixtures in question for a vocational plumbing class at MacArthur South, that these fixtures were intended for instructional use in this class and were never intended for Jones' personal use, and that the plumbing fixtures selected for Jones' vacation home in Naples, Florida, had nothing whatever to do with the plumbing equipment planned for the aforesaid high school class.
In support of its asserted theory of guilt, the state, without dispute, presented no direct evidence of guilt, no confessions or admissions by the defendant Jones, and no eyewitness or accomplice testimony. Instead, the state relied entirely on an elaborate set of circumstantial evidence which it contends was of such a nature that a reasonable jury could have found that the state's theory of guilt had been proven by the evidence, to the exclusion of any reasonable hypothesis of innocence. Succinctly stated and viewed in a light most favorable to the state, that evidence established the following.[2]

A
At all times material to this case, the defendant Jones was the superintendent of the Dade County public school system, and the separately-tried co-defendant Solomon Barnes was the principal of MacArthur South in the Dade County public school system. MacArthur South is an alternative high school offering a variety of vocational training programs for disadvantaged and underprivileged students. The defendant Jones and Solomon Barnes were close professional colleagues and personal friends in the Dade County public school system. Both had a keen interest in alternative high school programs such as that offered at MacArthur South.

1
On either January 5, 1980 or January 19, 1980,[3] the defendant Jones and the co-defendant Barnes went to the Miami office of the Bond Plumbing Supply, Inc. ["Bond"], a state-wide wholesale plumbing firm with offices also in Ft. Lauderdale, West Palm Beach, Orlando, Tampa, Daytona Beach and Lakeland, and were waited on by Aldo Delgado, a Bond employee. Both men introduced themselves and stated that they were going to set up a high school class to get students from an underprivileged background involved in the plumbing trade and wanted to look at "a real good product" (R.648). Mr. Delgado showed them some damaged and cheap plumbing fixtures *307 which they said they would think about. The two men browsed throughout the showroom looking at many plumbing displays including expensive items such as sunken bathtubs, "lowboy" toilets, and sinks with expensive fittings. During their tour of the showroom, Mr. Delgado heard the defendant Jones tell the co-defendant Barnes, "Well, you are going to have the final picking" or "You are going to have the final decision on what is needed" (R.648). The men looked around the showroom for twenty to forty-five minutes, asking "normal" questions about the various displays before leaving with some catalogs, including an American Standard catalog introduced in evidence as State's Exhibit No. 1. Mr. Delgado told them how to get prices and place orders for the firm's plumbing fixtures.
Later, approximately a week and a half prior to January 29, 1980, Bonnie Blackstock, a pricing clerk at Bond, received a telephone call from the co-defendant Barnes who identified himself as the principal of "Douglas MacArthur" (R.697).[4] Barnes stated that he was "starting a course," "a plumbing course" in the second semester and requested prices on a series of plumbing items (R.698). These items included bathtubs, lavatories, toilets, a bidet, a Jacuzzi, a triple-bowl kitchen sink, and assorted fittings (faucets, faucet handles, bath showerheads, etc.). Nearly all items requested were "top of the line" equipment (R.707). Some of the fittings requested were chrome-plated; others were 24-karat gold-plated. The pricing clerk brought this latter fact to Barnes' attention, and Barnes stated he was aware of this fact and wanted these items. All of the items requested were in colors other than white.
In the seven years she had worked at Bond, Ms. Blackstock had always dealt with plumbers in giving school board prices; this was the first time she had ever dealt with a school principal. In addition, she had never received a school board order for plumbing equipment in a color other than white. Because of these unusual circumstances, together with the expensive nature of the equipment being priced, she was skeptical whether Barnes was really with the school board as he claimed. She therefore gave Barnes the standard retail prices on the items requested, without the usual school board discount. Sometime, either before this conversation or later, during a weekday in January, Barnes came to the Bond store in Miami and did some pricing of other plumbing equipment, apparently from a "Delex" catalog (R.773-74, 776).

2
On or about January 25, 1980, subsequent to these pricings, Barnes initiated a school system requisition order for the purchase of certain plumbing equipment from Bond; the delivery date for this equipment, as noted on the order, was February 29, 1980 (State's Exhibit No. 3). A total of thirty-three (33) plumbing items were requested in this order. Most of these items (26) were taken by order number from the American Standard catalog (State's Exhibit No. 1), which Barnes had previously been furnished during his tour of the Bond store; two (2) of the items were taken from a Delex catalog which Barnes had when he priced some Delex fittings at the same store. The record is silent as to what catalog the remaining six (6) plumbing items were taken from. The subject order form described each plumbing item requested, its stock number, its color (if any), its quantity, and its price as follows:

*308
 QUANTITY
 & UNIT TOTAL
STOCK # COLOR[5] UNIT PRICE PRICE
----------------------------------------------------------------------------
2650.019 Fontaine Bathing pool with
grab bar and right drain[6] gold 1 751.88 751.88
5010.11 Luxette Bidet complete with
fittings[7] gold 1 536.33 536.33
2004.018 Concord Toilet[8] avocado 1 430.48 430.48
2003 Luxor Toilet with vent-away[9] regency
 blue 2 680.55 1361.10
 gold 1 680.55 680.55
2605 Spectra with right drain regency
5" long[10] blue 1 405.00 405.00
LCR4322-C Triple bowl stainless stainless
sink with center disposal well[11] steel 1 621.90 621.90
3201.035 Circlyn lavatory 18" regency
diameter[12] blue 2 65.25 130.50
0481.010 Aqualady (4" center) gold
21" x 18"[13] green 2 135.00 270.00
*309 0470.039 Ovalyn (21" x 17") green 1 65.78 65.78
(19" x 16")[14] gold 1 60.30 60.30
2109.395 Water Saver[15] gold 1 113.03 113.03
2248.565 Spread Fitting[16] chrome 2 533.93 1107.86
2248.581 Spread Fitting[17] 2 370.67 741.34
1303.544 Basic Fitting[18] 1 167.63 167.63
1414.028 Stero [sic] Shower
head[19] 1 91.67 91.67
1623.032 Divider Spout[20] 1 115.52 115.52
1444.025 Heritage Shower Arm with
adjustable flange[21] 1 77.45 77.45
1303.577 Bath Shower Fitting[22] 2 54.08 108.16
2103.711 Center Set Fitting[23] 2 42.23 84.46
2103.778 Faucet[24] 2 249.39 498.78
4190.203 Aquamix fitting with
handle[25] 1 23.18 23.18

*310
9800 Jacuzzi Elite with 1/2 H.P.
Motor[26] 1 360.00 360.00
804 Deltique faucet for lavatory with
matching two-handle widespread faucet
with pop-up[27] 1 55.43 55.43
846 Deltique tub and shower
faucet[28] 1 76.16 76.16
 ________
 TOTAL: 8,934.49

These above items carried a total retail price of $8,934.49 according to the prices given to Barnes by Bond's pricing clerk, Bonnie Blackstock. With the school board discount, however, which was not given to Barnes, the total price would have been closer to $6,000. This requisition order was sent to Dr. Robert Paskel, Associate Superintendent for Business Services, Dade County Public Schools.
Accompanying this requisition was a memorandum from Barnes to Dr. Paskel requesting authorization for an emergency purchase "in order to initiate a comprehensive vocational program in the building trades" (State's Exhibit No. 4). Simultaneous with this requisition, Barnes also put through a $15,000 request from a "special needs" account to Dr. J.L. DeChurch of the school board. This request sought $3,000 to purchase basketball uniforms and $12,000 to purchase "materials and supplies" for use in a planned expansion of vocational programs at MacArthur South to include hands-on training in the "building trades" area. These funds were approved and transferred to MacArthur South's account on January 31, 1980. The above process was initiated without undertaking the usual bid-taking procedure, which would have taken weeks to complete. It was done pursuant to an established school board emergency process or SAR (Superintendent Approved Requisition) method which avoided the bid process.

3
On January 24 or 25, 1980, Dr. Paskel received a telephone call from the defendant Jones, who informed him that a requisition order would be coming through from MacArthur South and requested him to give the matter his personal attention. Dr. Paskel testified that he did not consider this call [or other calls from the defendant Jones on this matter] to be unusual inasmuch as the defendant Jones had a special interest in alternative schools like MacArthur South and was particularly concerned with the efforts of these schools to get troubled youth off the streets and build them into productive citizens.
On January 25, 1980, Barnes made an appointment and personally saw Dr. Paskel *311 at the latter's office. At this meeting, Barnes had the above-stated requisition order in hand, showed it to Dr. Paskel, and requested that it be approved. Barnes stated[29] in response to Dr. Paskel's questions, that the proposed plumbing class [for which the plumbing equipment was needed] was an FTE program [i.e., a class for full-time students with a full-time teacher five hours a week], that Barnes' supervisor, Sonny Gross, knew of the proposal, and that Barnes had sufficient funds in his school account to cover the proposed expenditure. Barnes also stated he was attempting to get the program implemented at the beginning of the school second semester and that there was a need for such a program in view of local labor market shortages of plumbers in the construction trades. Dr. Paskel thereupon approved the requisition order.
Later that day, Dr. Paskel discovered that Mr. Gross had not been informed of the program and sent for Barnes for a second conference. When Barnes returned for this conference, the defendant Jones' signature had in the meantime been placed on the requisition order as having approved the order. Dr. Paskel was satisfied with Barnes' explanation for his not having talked to Mr. Gross about the program, and attached a memorandum to the director of purchasing requesting that the order be expedited.
No high school plumbing class had been created at the time the above requisition order was put in motion by Barnes. However, the school board witnesses who testified below indicated that this was not unusual in an alternative school like MacArthur South, inasmuch as the principal of such a school has much leeway in starting classes on his own, that equipment is usually ordered for a class before the class is set up, that it was a relatively fast and easy process to hire vocational teachers from the ranks of outside tradesmen, and that Barnes had mentioned at least tentative plans to start a building trades cluster at MacArthur South to his supervisor, Sonny Gross, and to others. As to the expensive nature of the plumbing equipment ordered by Barnes, there is also testimony below that the other vocational training classes at MacArthur South, such as the printing, industrial arts, and auto mechanics classes, were all equipped with top quality materials because Barnes, rightly or wrongly, believed that disadvantaged youth should be trained in his school with nothing but the best equipment (R.850-52).

4
On January 29, 1980, at approximately noon, Barnes took the signed requisition order to Leo Kerr, the Director of Purchasing for the Dade County School Board, explained[30] that he was starting a plumbing class similar to an apprentice program at his school, and wanted the requisition order converted into a formal purchase order. Mr. Kerr, in turn, called Edna Willbanks, one of the buyers for the school board, to verify the prices on the requisition order with Bond. Ms. Willbanks made the requested call, but was unable to verify the prices on the order and reported this information to Mr. Kerr. Barnes then stated that he had personally verified the prices in a telephone call to Bond. Mr. Kerr thereupon issued the requested purchase order for Barnes who then left with the signed purchase order.
Prior to Barnes' arrival at the Bond store that day, several telephone conversations took place between Mr. Kerr's office and Bond employees. Edna Willbanks spoke to *312 Bonnie Blackstock, the pricing clerk at Bond. Ms. Blackstock, as previously stated, had not given Barnes the usual school board discount in her prior telephone conversation with him, due to her skepticism concerning Barnes' true identity. Realizing her mistake, Ms. Blackstock so informed her office manager, Ms. Cherry, and also pointed out to her that several of the plumbing fittings on the requisition order were gold plated. Ms. Cherry relayed this information in a telephone conversation to Mr. Kerr. Mr. Kerr, as a result of this conversation, cancelled the purchase order because of the mistake in the prices and the gold-plated feature of some of the plumbing fittings ordered. He told Ms. Cherry that Barnes would be coming over with the aforesaid purchase order, and asked her to have Barnes call him when he arrived at the store.
Meanwhile, Barnes took the signed purchase order in question to the Bond store in Miami and spoke to Frank Allbright, a Bond employee.[31] Barnes identified himself, gave Mr. Allbright the purchase order, and said he "would like to get these plumbing fixtures" (R.784). Mr. Allbright asked if Barnes wanted the equipment delivered by the store and Barnes replied, "No, I want to take them with me" (R.785). The plumbing equipment in question weighed, without dispute, several tons; Barnes did not have anyone with him to help carry out these fixtures, and there is no evidence that he was there with a truck or similar type vehicle to transport the equipment. Barnes did not indicate when he intended to physically take the plumbing items on the purchase order, which itself indicated a delivery date of February 29, 1980 (State's Exhibit No. 3).
Barnes asked Mr. Allbright to verify the prices on the plumbing equipment. Mr. Allbright took Barnes to another department at the store for that purpose. At that point, Barnes was informed that the purchase order had been cancelled by Mr. Kerr and that Mr. Kerr wanted Barnes to call him. Barnes then telephoned Mr. Kerr from the store and was informed that the order had been cancelled, that the purchase of gold-plated fittings could not be allowed, and that the purchase order would be picked up at school the next day. Barnes simply said "all right" (R.887).

5
Dr. Paskel later received a telephone call from Mr. Kerr "sometime during the afternoon of January 29th" (R.980) and was apparently informed of the above cancellation, although the content of this conversation is very sketchy.[32] Dr. Paskel, in turn, telephoned the defendant Jones' office sometime during the day and apparently informed someone [the defendant Jones or his secretary] that the purchase order had been cancelled, although the evidence on this subject is also very sketchy, inasmuch as Dr. Paskel's memory on the subject was "hazy" (R.983). That night, however, at approximately 11:00 P.M., Dr. Paskel received a telephone call at his home from Barnes.[33] Barnes stated that he had just talked to the defendant Jones and had been asked to call Dr. Paskel at this late hour to inquire as to the status of the requisition order (R.982). Dr. Paskel indicated that the order had been cancelled, that Barnes should contact the purchasing office (Leo Kerr) to revise the order, restructure it, and correct any pricing discrepancies and *313 other errors. The defendant Jones telephoned Dr. Paskel the next morning and virtually the same conversation took place as the one the previous night between Dr. Paskel and Barnes. Dr. Paskel saw nothing unusual in the defendant Jones' telephone calls on this matter in view of the latter's long-standing interest in alternative schools like MacArthur South.
Barnes, in response to Dr. Paskel's advice, telephoned Mr. Kerr the next day to inquire how to reinitiate the purchase order. Mr. Kerr encouraged Barnes to do so, advised him how to do it, and stated that he should pick out fittings which were not gold plated. Barnes stated,[34] however, that he was a little discouraged with the whole matter, that he didn't know whether he would do it or not, and that he felt he had been treated like a criminal in the whole process. The purchase order was, in fact, never reinitiated by Barnes.

6
On February 6, 1980, James Baker, a specialist in building trades and construction work, attended a meeting at the Dade County School Board Conference Room, at which the defendant Jones and Barnes were present. Mr. Baker was requested to provide technical assistance for a vocational construction trades program which was going to start at MacArthur South and would include a plumbing class. He testified that he would not personally use any of the plumbing equipment listed in the American Standard catalog (State's Exhibit No. 1) in starting such a school plumbing class due to the expensive nature of the equipment listed. He did state, however, that he could understand a different point of view on this subject such as that held by Barnes (R. 1060, 1065).

B
On October 9, 1979, prior to all these events, the defendant Jones entered into a $121,086 contract with Craig Meffert, a general building contractor, to build a vacation home for Jones near Naples, Florida. On October 18, 1979, the defendant Jones approved architectural plans for the house, which were filed with the local building department (State's Exhibit No. 13). These plans called for a two-story house with four bedrooms, three and a half baths, and a garage. There was to be a master bedroom upstairs, with an adjoining bathroom; this bathroom had a tub and shower, two sinks, a toilet, and a bidet. There were three planned bedrooms downstairs, with two bathrooms; the hall bathroom was designed as a half-bath with one toilet and a sink, and the guest bathroom, which was near the three bedrooms, had a tub and shower, two sinks, and a toilet. There was also to be a bathroom with a toilet, a sink, and a shower, off the garage; and a sauna adjoining this bathroom. Finally, there was to be a kitchen downstairs, with a double-bowl sink; and, apparently, a large adjoining patio with a built-in, six-foot diameter Jacuzzi.
On the face of these plans, there was no indication given as to the type, brand, or color of any of the above-stated plumbing equipment. There was also no indication given as to the dimensions of any of this equipment, other than the six-foot diameter Jacuzzi; in addition, the plans were entirely silent as to the plumbing fittings required, i.e., faucets, showerheads, etc. These omitted details were apparently left up to the individual taste of the owner and were not required to be written into the plans as filed with the building department.

1
On December 22, 1979, after some preliminary discussions, Mr. Meffert met with the defendant Jones and his wife at Mr. Meffert's office near Naples, Florida, for the purpose of discussing what specific items, not called for in the plans, would be going in Jones' vacation home. The co-defendant Barnes was present during most of this meeting. It was apparently a wideranging discussion lasting two or three *314 hours and covered, among other things, the specific plumbing equipment which was going in the house. Mr. Meffert had previously informed the Joneses that he generally used plumbing fixtures of a medium line or better, that he used in particular "elongated toilets" (longer than regular toilets) and Kohler or Eljer cast iron tubs (R. 1170-71). Color sheets, plumbing samples, and some catalogs were spread around Mr. Meffert's office and were apparently consulted during the course of the meeting.
As the discussions progressed, Mr. Meffert made certain notes on the Joneses' expressed preferences in plumbing fixtures (State's Exhibit No. 14). These preferences, however, were limited to the colors they desired in the plumbing fixtures. No decisions were made and very little was discussed as to the design, brand name, material composition, or dimensions of the plumbing equipment required; in particular, there was no discussion whatever on the required plumbing fittings, i.e., faucets, showerheads, etc. These matters were apparently left open for another day, as only the colors were finalized. In all of these discussions, however, the defendant Jones made it clear that he was interested in getting high quality items.
The Joneses decided that all the bathrooms in the house would be done in ceramic tile. The bathroom in the garage was to be in "harvest gold" with a "corinthian marble sink, gold frost;" the cabinets in this bathroom were to be in "highland oak" and the shower was to be "harvest gold mixed with white tile" (R. 1179; State's Exhibit No. 14). There were no decisions made and no discussions conducted on the adjoining sauna. The guest bathroom downstairs was to have a "twilight blue" tub and toilet, and a "corinthian marble top" in "blue frost ROS-1 lagoon blue;" it was not clear what color the sink and shower were to be, but apparently they were also to be "twilight blue" (R. 1180; State's Exhibit No. 14). The hall bathroom colors are somewhat confusing, but apparently the toilet was to be "frost green" and the sink "corinthian marble" with "frost green" (R. 1180; State's Exhibit No. 14). The kitchen sink downstairs was to be "stainless steel" (R. 1180; State's Exhibit No. 14). Beyond some expressed interest in "low boy toilets" and their respective cost, there were no specifics mentioned as to the brand name, type or dimensions of any of the above plumbing equipment.
The bathroom off the upstairs master bedroom was discussed in more detail than were the downstairs bathrooms. Mr. Meffert stated that he would use Eljer or Collier plumbing fixtures in this bathroom (R. 1176-77) and that there would be a five-foot, cast iron tub (R. 1176). There was considerable discussion on whether the tub should be five or six feet long and on whether a ramp should be built around the tub so as to give it a sunken appearance, but no final decisions were made thereon. The color of the tub and toilet in the bathroom was to be "desert gold," the vanity "harvest gold," and the "top," which apparently included the sink, "corinthian marble" with "gold frost." There were no decisions made on the color of the bidet and apparently the matter was not discussed.
None of the brand-name colors selected by the Joneses during the December 22, 1979, meeting for their above-stated plumbing equipment, to wit: harvest gold, gold frost, corinthian marble, desert gold, twilight blue, lagoon blue, frost green, and highland oak, are among the brand-name colors requested by the co-defendant Barnes for the plumbing equipment in the January 25, 1980, order form previously discussed (State's Exhibit No. 3). Moreover, the brand-name colors selected by the Joneses, as stated above, were not taken from any of the brand-name colors offered in the American Standard catalog (State's Exhibit No. 1), see supra note 5, which Barnes primarily used in placing his plumbing equipment order of January 25, 1980. Indeed, the brand-name colors of gold and regency blue appearing in Barnes' aforesaid requisition order are taken directly from the American Standard catalog (State's Exhibit No. 1), see supra note 5, with the remaining two colors (avocado and green) coming from catalogs undisclosed by this record. The two plumbing items *315 listed as having a "green" color on Barnes' order form, however, are two bathroom sinks which were taken from the American Standard catalog (State's Exhibit No. 1). The only two colors listed in the American Standard catalog (State's Exhibit No. 1) as coming close to "green" are "bayberry" and "aegean mist," neither of which colors was selected by the Joneses for any of their vacation home plumbing fixtures. Finally, and perhaps most significantly, neither the defendant Jones nor his wife made any request for, or even discussed, gold-plated plumbing fittings or fixtures of any kind, in this or any other meeting with Mr. Meffert or anyone else. Subsequent to these color scheme decisions and other discussions, the December 22, 1979, meeting was concluded.

2
On January 15, 1980, Mr. Meffert again met with the defendant Jones and his wife at Mr. Meffert's office near Naples and further discussions were held on the specific plumbing equipment which would be going in the vacation home; in particular, these discussions focused on the upstairs bathroom of the master bedroom and on the sink in the downstairs kitchen. The co-defendant Barnes was with the Joneses at that time, but remained in Mr. Meffert's outer offices and was not actually present during the meeting. The Joneses brought with them as a basis for their discussions some specially-drawn sketches for the proposed bathroom off the upstairs master bedroom and for the downstairs kitchen (R. 1194; State's Exhibit No. 17); they also brought along a Kohler plumbing catalog which was stamped "Bond Plumbing" (R. 1188-92, 1194; State's Exhibit No. 18). Mr. Meffert, in turn, made certain notes as to the Joneses' preferences on the proposed plumbing equipment (R. 1186; State's Exhibit No. 16); he also made some notes on the above-stated bathroom and kitchen sketches brought by the Joneses (R. 1186, 1194-95; State's Exhibit No. 17).
As the proposed sketches indicate and Mr. Meffert's notes confirm, the Joneses decided to put a six-foot tub, with a ramp built around it to give a sunken appearance, in the upstairs bathroom off the master bedroom (R. 1196). The toilet and the bidet were to be rearranged in the bathroom so as to accommodate these changes (R. 1196). There was no discussion as to the material composition or brand of bathtub to be ordered (R. 1197). There was also some discussion on "one piece" toilets for the bathroom, and their respective costs, but apparently no decisions were made thereon (R. 1198). As for the kitchen sink downstairs, the Joneses decided to have a triple-bowl sink, instead of the double-bowl sink originally planned, which decision is reflected by the Joneses' proposed kitchen sketch (R. 1198-99; State's Exhibit No. 17, p. 2). Mr. Meffert's notes and trial testimony indicate that the Joneses were interested in something similar to the triple-bowl sink which is pictured at page twenty-seven of the Kohler catalog (State's Exhibit No. 18) the Joneses had brought with them and showed to Mr. Meffert, except that the Joneses wanted the sink in stainless steel rather than enameled cast iron as depicted in the catalog (R. 1187-93). There was apparently no discussion of the triple-bowl kitchen sink manufactured by Elkay, the item listed in Barnes' aforesaid plumbing class order.
The Joneses further stated that they wanted Mr. Meffert to call plumbing companies in Miami to see if he could get better prices and faster delivery on the plumbing equipment. Mrs. Jones gave Mr. Meffert the names of two such companies: Charles Sales Exports and Bond Plumbing Supply, Inc. Mr. Meffert attempted to call the latter company that day, but was unable to obtain any prices as he was informed that only plumbers could obtain such prices (R. 1200-01); he apparently did not call Charles Sales Exports in Miami (R. 1201). The defendant Jones also requested, indeed insisted, on many prior and subsequent occasions, that Mr. Meffert supply a price list from the plumbing subcontractor who was working on the house as to the prices of the plumbing equipment used to bid on the job. The defendant *316 Jones wanted this list so as to compare it against lower prices he might be able to obtain in buying his own plumbing equipment in or out of Miami, which would thereby earn him a credit for the price bid by the subcontractor and therefore a savings equal to the difference between the two prices (R. 1202-07). Such a list was subsequently sent by Mr. Meffert to the defendant Jones sometime thereafter (State's Exhibit No. 19). The January 15, 1980, meeting ended after the above-stated matters had transpired.

3
On January 29, 1980, "sometime in the afternoon" (R. 1208), the defendant Jones telephoned Mr. Meffert at the latter's office near Naples, Florida. Mr. Meffert testified at trial to the nature of this conversation as follows:
"Dr. Jones called and said that, `Craig, I want you to stick around the office, because I have got plumbing fixtures coming over.'

And I said, `I do have a meeting tonight.'
He said, `Craig, they will be probably there between 3:00 and 5:00, or before 5:00, something like that. Make sure you stay there, because the man that is going to be bringing them,' I have thought about this a hundred times, I believe he said, `has only been over here once,[35] and will have to find the way.'" (R. 1208) (emphasis added).
"When he had talked to me that day he said, `All of the fixtures are coming over.' Did I have a place to put them.
And I said, `Yeah.' I was either going to put them in my storage building, that I was building at that time, or my barn at my home." (R. 1227).
The defendant Jones did not say where the plumbing fixtures had been acquired, from what city the plumbing fixtures would be delivered, or the name of the person or persons who would be delivering the fixtures; he also did not describe the fixtures in any way.
Mr. Meffert waited at his office, as requested, until 7:00 P.M. He then telephoned the defendant Jones at his home in Miami and talked to Mrs. Jones. He told her that he was still waiting for the plumbing fixtures as requested by the defendant Jones but that none had arrived. He wanted to know if the fixtures were still coming or whether the man delivering them had gotten lost. Mrs. Jones stated[36] that she would call her husband and then put Mr. Meffert on hold. She subsequently came back on the line and said: "Dr. Jones said, `Go ahead and wait, they are going to be there'" (R. 1225). Mr. Meffert agreed to wait a bit longer. About half an hour later at 7:30 P.M., Mrs. Jones telephoned Mr. Meffert and said, "Craig, Dr. Jones was tied up in a meeting and didn't get a memo, or something that was put on his desk, and the fixtures are not coming" (R. 1226). Mr. Meffert then went home.
Several days later, the defendant Jones telephoned Mr. Meffert at his home in Naples. Jones stated that he had decided to go ahead with the fixtures on the list (State's Exhibit No. 19) which Mr. Meffert had previously sent to Jones at the latter's insistence. This was a list of plumbing fixtures proposed by the plumbing subcontractor.
On February 8, 1980, at approximately 6:00 P.M., the defendant Jones telephoned Mr. Meffert again at the latter's home. Mr. Meffert was about to have dinner and requested that Jones call him later. The *317 defendant agreed and Jones called again at 11:30 P.M. just about the time that Mr. Meffert had seen Jones on television on the late news. Jones stated that he wanted to make some changes in his house plans. He stated he wanted to eliminate the garage bath from the plans, but still put the bath in the house. As for the bathroom off the master bedroom, he wanted to go back to a five-foot bathtub, to eliminate the bidet, and to have one, instead of two sinks. He also wanted to go back to the double-bowl sink in the kitchen. When Mr. Meffert asked why all these changes, the defendant Jones stated, "Craig, there is a lot of people after me. They don't like to see a man get ahead... especially to the news media" (R. 1232). Jones indicated that Channel 10 in Miami and The Miami Herald were after him. He said, "They are jealous, and they hate to see me get ahead" (R. 1232). Jones asked to meet Mr. Meffert the following Monday in Miami so that they could go to the Keys because it was very important that they talk.
The next day at 6:00 P.M. the defendant Jones telephoned Mr. Meffert at the latter's home for the last time. Mr. Meffert stated that he could not change the plans, that he couldn't do anything illegal. Jones replied, "Craig, I'm not a crook... . What I'm asking you to do, is there anything wrong with a customer making changes in his house?" (R. 1235-36). Mr. Meffert agreed that there was nothing wrong with that. The new plans, however, were never drawn and the two never met or talked again.

4
On February 16, 1980, at 4:30 P.M., Mrs. Jones came to Mr. Meffert's office near Naples, Florida. She wanted to know what Mr. Meffert was going to tell the news media and the state attorney. Mr. Meffert said he couldn't do anything illegal and showed her the Kohler plumbing brochure which the Joneses had previously brought to him with "Bond Plumbing" stamped on it (State's Exhibit No. 18). Mrs. Jones requested the return of this brochure and Mr. Meffert complied. She also requested the sketches for the bathroom off the master bedroom and for the downstairs kitchen (State's Exhibit No. 17), which the Joneses had previously left with him; Mr. Meffert did as he was requested, but retained a copy of the sketches for his files. Mr. Meffert then ushered Mrs. Jones out of the office, apparently unseen by a Channel 7 television reporter who was present at the door about that time. On February 14 or 15, 1980, Mr. Meffert was interviewed at his office by reporters from The Miami Herald concerning this case; on February 16, 1980, he gave a statement to these reporters.

C
The defendant Jones, through counsel, made a motion for a judgment of acquittal at trial, both at the close of the state's case and at the close of all the evidence. The basis for these motions was that the state's circumstantial evidence failed to establish a prima facie case of attempted grand theft against the defendant Jones in that it failed to exclude every reasonable hypotheses of innocence. It was urged that the evidence failed to exclude the reasonable hypothesis of innocence that the plumbing fixtures ordered by Barnes were intended for a high school plumbing class, that the defendant Jones was not involved in any criminal activity with respect to his vacation home, and that his efforts to change the plans for his vacation home after the news media started investigating the case was consistent with an innocent high-ranking public official trying to protect himself against the suspicious innuendoes of an overzealous press.
The trial court denied these motions and the jury convicted the defendant Jones as charged. The trial court entered an adjudication of guilt and placed the defendant Jones on five (5) years probation with various special conditions, including one year of prison incarceration. This appeal follows.

II
Section 812.014(1)(a), (b), (2)(b)1, Florida Statutes (1979), which the defendant Jones *318 was charged with and convicted of violating, provides as follows:
"(1) A person is guilty of theft if he knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent:
(a) To deprive the other person of a right to the property or a benefit therefrom.
(b) To appropriate the property to his own use or to the use of any person not entitled thereto.
... .
[(2)](b) It is grand theft of the second degree and a felony of the third degree, punishable as provided in ss.775.082, 775.083, and 775.084, if the property stolen is:
1. Valued at $100 or more, but less than $20,000."
"The legislature's use of the word `endeavors' in the theft statute [§ 812.014(1), Fla. Stat. (1979)] is equivalent to the use of the word `attempts.' To endeavor to do something means to make an attempt to do it." Miles v. State, 374 So.2d 1167, 1168 (Fla. 2d DCA 1979). "This statute is different from the previous grand larceny statute in that no distinction is made between the theft and the `endeavor.' `[E]ndeavor' means `attempt' and the law now makes no distinction between the actual stealing and the attempt to steal and punishes both the same." Bell v. State, 382 So.2d 107, 108 (Fla. 5th DCA 1980). As the defendant Jones was charged herein with an "endeavor" to commit a grand theft, this was equivalent to charging him with attempted grand theft.
There are two essential elements to the crime of attempted grand theft under the above statute. First, there must be a criminal intent "(a) [t]o deprive the other person of a right to the property or a benefit therefrom, [or] (b) [t]o appropriate the property to his own use or to the use of any person not entitled thereto," § 812.014(1)(a), (b), Fla. Stat. (1979), which property must be "[v]alued at $100 or more, but less than $20,000," § 812.014(2)(b)1, Fla. Stat. (1979); this amounts, in effect, to a specific criminal intent to permanently deprive the owner of his property valued at $100 or more, but less than $20,000. State v. Allen, 362 So.2d 10, 11 (Fla. 1978). Second, there must be "an overt act manifesting [the above-stated] criminal intent," State v. Allen, supra at 12, "to obtain or use the property of another," § 812.014(1), Fla. Stat. (1979), and "apparently adapted to effectuate that intent, carried beyond mere preparation, but falling short of execution of the ultimate design." Gustine v. State, 86 Fla. 24, 26, 97 So. 207, 208 (1923).

A
As is true of any crime, the above-stated two elements of attempted grand theft may be established by the state at trial through direct or circumstantial evidence. "Direct evidence is that to which the witness testifies of his own knowledge as to the facts in issue. Circumstantial evidence is proof of certain facts or circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist." Davis v. State, 90 So.2d 629, 631 (Fla. 1956). Where, however, the state relies entirely on circumstantial evidence to establish a charged crime, as here, Florida law for good reason has long imposed a special and strict standard of proof which the state's evidence must satisfy in order to survive a defense motion for judgment of acquittal at trial. This standard is oft-stated in the Florida cases in varying language and has no particular canonical form. The following leading Florida cases, however, appear to summarize in substance the applicable circumstantial evidence standard:
"Circumstantial evidence may be relied upon to establish guilt, but the value of this kind of evidence consists in the conclusive nature and tendency of the circumstances relied upon. They must not only be consistent with guilt, but must be inconsistent with innocence. Such evidence is always insufficient where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true. What circumstances will amount to proof can never *319 be [a] matter of general definition. The legal test is their sufficiency to satisfy the understanding and conscience of the jury, to the exclusion of every reasonable doubt." Whetston v. State, 31 Fla. 240, 12 So. 661 (1893) (syllabus by court, para. 1).
"Although absolute metaphysical and demonstrative certainty is not essential to sufficient proof of circumstances in a prosecution for crime, nevertheless, in order to invest mere circumstances with the force and effect of lawful proof, those circumstances, taken together must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion of guilt, and must produce in effect a moral certainty that the accused, and no one else, committed the offense, before a verdict of guilty is authorized.
To sustain a conviction in a prosecution for crime, it is not sufficient that the facts proven create a strong probability of guilt, or are consistent therewith; the facts must be inconsistent with innocence.
The value of circumstantial evidence, and its effect as proof, depend upon the conclusive nature and tendency of the circumstances relied upon to establish the controverted fact. If any fact essential to a conviction is not legally established to a moral certainty, the evidence is inconclusive and cannot be said to be sufficient in law to satisfy the mind and conscience of a jury." Davis v. State, 90 Fla. 816, 107 So. 245 (1925) (syllabus by court, para. 1-3).
"When circumstantial evidence is relied upon to convict a person charged with a crime, the evidence must not only be consistent with the defendant's guilt but must also be inconsistent with any reasonable hypothesis of his innocence. (citations omitted). And evidence which leaves one with `nothing stronger than a suspicion' that the defendant committed the crime is not sufficient to sustain a conviction. (citation omitted).
Circumstantial evidence is never sufficient to support a conviction where, after there is assumed all to be proved which the evidence tends to prove, another hypothesis still may be true, because it is the actual exclusion of each other hypothesis which clothes mere circumstances with the force of proof. Thus evidence leaving uncertain which of several hypothesis may be true, or establishing only a probability favoring one hypothesis rather than another, cannot be equal to proof of guilt, no matter how strong the probability may be. (citation omitted)." Mayo v. State, 71 So.2d 899, 904 (Fla. 1954).
"When the State relies upon purely circumstantial evidence to convict an accused, we have always required that such evidence must not only be consistent with the defendant's guilt but it must also be inconsistent with any reasonable hypothesis of innocence. (citations omitted).
Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, it is not sufficient to sustain conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence." Davis v. State, 90 So.2d 629, 631-32 (Fla. 1956).
More recently, this long-established standard on the sufficiency of circumstantial evidence to convict of a crime was succinctly restated as follows:
"A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. In McArthur v. State, [351 So.2d 972 (Fla. 1977)] (citation omitted), *320 we reiterated this standard to be that `[w]here the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence.'" Jaramillo v. State, 417 So.2d 257, 257 (Fla. 1982).
"When a case is based on circumstantial evidence, a special standard of sufficiency of the evidence applies. (citation omitted). This standard is: `Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence.' (citations omitted). The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse a judgment based upon a verdict returned by the jury." Heiney v. State, 447 So.2d 210, 212 (Fla. 1984).

B
Although each case must necessarily stand or fall on its own unique facts, it is fair to say that Florida courts have proceeded with "extreme caution" when reviewing criminal convictions based solely on circumstantial evidence, Head v. State, 62 So.2d 41, 42 (Fla. 1952); Harrison v. State, 104 So.2d 391, 395 (Fla. 1st DCA 1958), and have applied the above-stated circumstantial evidence standard fairly rigorously when evaluating the sufficiency of such evidence to convict. In an unbroken line of decisions dating back nearly a century, Florida courts have consistently reversed criminal convictions, including larceny and theft convictions, based solely on circumstantial evidence when that evidence, although suspiciously pointing to the defendant's guilt, failed to exclude every reasonable hypothesis of innocence, due to one of the following factors: (1) certain deficiencies or gaps in the state's case which did not sufficiently link the defendant to the crime charged,[37] did not sufficiently establish a requisite criminal *321 intent or guilty knowledge,[38] or otherwise left intact a viable hypothesis of innocence,[39] (2) certain affirmative proofs of *322 innocence, frequently the defendant's own trial testimony or statements to the police, which were not sufficiently negated by the state's evidence,[40] or (3) a combination of *323 both of the above factors.[41] In each of these cases, the court has concluded, either explicitly or implicitly, that the evidence failed as a matter of law to exclude every reasonable hypothesis of innocence and *324 that no jury could reasonably find otherwise.
Only when the state's case has gone beyond such suspicion, has not suffered from the foregoing infirmities, and has unerringly pointed to the defendant's guilt to the exclusion of every reasonable hypothesis of innocence, have Florida courts allowed criminal convictions based solely on circumstantial evidence to stand.[42] In each of these cases, the court has concluded, either explicitly or implicitly, that the state's evidence excluded every reasonable hypothesis of innocence and that a jury could reasonably so find.
The underlying justification for the circumstantial evidence standard, as stated *325 *326 above, and its corresponding rigorous enforcement seems obvious enough. The finger of suspicion implicit in circumstantial evidence is a long one and may implicate both the innocent and guilty alike. Persons caught in a web of circumstances may often appear guilty upon first impression, but in fact be entirely innocent as surface appearances are frequently deceiving. A person ought not be convicted of a crime, it is thought, and his freedom taken from him based on such tenuous and ambiguous evidence. To avoid, then, convicting entirely innocent people based on suspicion and innuendo, the law has long demanded a high standard of proof when reviewing convictions based entirely on circumstantial evidence. Given our long-standing commitment to the ideal of individual freedom, this result seems both fair and reasonable. As has been often stated, "[o]ur responsibility in such circumstances  human liberty being involved  is doubly great," Head v. State, 62 So.2d 41, 42 (Fla. 1952), because "[t]he cloak of liberty and freedom is far too precious a garment to be trampled in the dust of mere inference compounded." Harrison v. State, 104 So.2d 391, 395 (Fla. 1st DCA 1958).

III
Turning to the instant case, we have no difficulty in concluding that the state's elaborate set of circumstantial evidence, as stated above, fails to exclude, as a matter of law, a reasonable hypothesis of innocence which is raised by this record, namely the hypothesis of innocence asserted by the defendant Jones at trial, to wit: that the plumbing equipment in question was ordered by the co-defendant Barnes for use in a high school plumbing class at MacArthur South, that this equipment was intended for instructional use in this class and was never intended for the personal use of the defendant Jones, and that the plumbing fixtures planned and ordered by the defendant Jones for his Naples vacation home had nothing whatever to do with the plumbing equipment ordered for the aforesaid high school class. The failure of the state's evidence to exclude this reasonable hypothesis of innocence is due, we think, to certain gaps or deficiencies in the state's case which leave this hypothesis intact, as well as to certain affirmative indications of innocence established by this record; indeed, no jury could reasonably find otherwise. Under the established law of this state, the defendant Jones was, therefore, entitled to the entry of a judgment of acquittal on the crime of second degree grand theft as charged by the information in this case.

A
First, the evidence is undisputed that Barnes initiated a formal, written school board requisition order for the plumbing equipment in question, pursuant to an established school board process that avoided the necessity for competitive bids. The requisition order proceeded through established school board channels and received the initial approval of the required school board officials before it was eventually cancelled. Thereafter, both Mr. Kerr and Dr. Paskel, the responsible school board officials, were supportive of Barnes' efforts to reinitiate the process; Barnes, *327 however, was understandably discouraged at the prospect and did not do so. At no time did Barnes attempt to cover up or disavow his efforts to obtain this equipment for high school use. Throughout the entire process, the avowed purpose for requesting the plumbing equipment in question was to use the equipment in creating a high school vocational plumbing course for disadvantaged youth at MacArthur South. Both Barnes and the defendant Jones had a keen interest in creating such programs for the underprivileged in the Dade County public school system and actively sought to create the planned program in this case; they were also close professional colleagues and personal friends.
This open and established method employed by Barnes for obtaining the plumbing equipment in question, the above-board procedure he followed in walking through the requisition order, and the lack of any effort by Barnes to conceal his actions throughout, raises in totality a "strong presumption" of his innocence, and therefore, the defendant Jones' innocence in this entire affair. It is well-settled under Florida law that
"In charges of larceny where the taking is open, and there is no subsequent attempt to conceal the property, and no denial, but an avowal of the taking, a strong presumption arises that there was no felonious intent, which must be repelled by clear and convincing evidence, before a conviction is authorized."

Cooper v. State, 82 Fla. 365, 366, 90 So. 375, 375 (1921) (syllabus by court, para. 2) (emphasis added); see also Tedder v. State, 73 Fla. 861, 75 So. 783 (1917); Dean v. State, 41 Fla. 291, 26 So. 638 (1899).
No such "clear and convincing evidence" was presented below to negate this aforesaid affirmative showing of innocence.
Although a high school plumbing class at MacArthur South had not been formally created at the time this requisition process was initiated, the evidence is uncontradicted that this was consistent with usual school board practice in creating vocational classes at an alternative high school such as MacArthur South. Under the established procedure, the vocational equipment is ordered first, a vocational teacher is found next, and the vocational course is then started. It is also undisputed that such classes could be created quite rapidly, that there was no problem in obtaining a vocational teacher in short order, and that flexibility in creating classes in an alternative high school was normal. Moreover, the evidence, without contradiction, shows that the principal of an alternative high school, such as MacArthur South, has considerable freedom in setting up such a plumbing course at his own option, and that the procedure followed by Barnes in formally establishing the plumbing course was open, above-board, and in accord with established school board policies.
It is true that Barnes ordered expensive top-of-the-line plumbing equipment for the high school plumbing class in question, including some gold-plated plumbing fittings. The evidence is undisputed, however, that expensive equipment was used in all the vocational training courses at MacArthur South, including the printing, industrial arts, and auto mechanics classes. It was Barnes' view  disputed, but recognized as understandable by Mr. Baker, the vocational training expert who testified below  that disadvantaged youth should be trained on top quality equipment. Mr. Baker stated that he himself would not use such expensive equipment, but at no time did he suggest that the equipment could not be used for training purposes in a high school plumbing class. Plainly, this equipment could, in fact, be utilized for a high school plumbing class as planned.

B
With regard to the plumbing equipment ordered by the defendant Jones for his vacation home in Naples, Florida, it is undisputed on this record that the defendant Jones and his wife ordered their plumbing equipment from their contractor, Mr. Meffert, in a color scheme which, on its face, *328 was entirely different from the plumbing equipment colors ordered by Barnes for his high school plumbing class. The Joneses ordered their plumbing equipment from Mr. Meffert in the following brand-name colors: harvest gold, gold frost, corinthian marble, desert gold, twilight blue, lagoon blue, frost green, and highland oak. None of these brand-name colors appear on Barnes' high school plumbing class order form and none are even listed as possible colors for the plumbing equipment advertised in the American Standard catalog (State's Exhibit No. 1), which Barnes primarily used in placing his school board order. Indeed, the Joneses did not even consult the American Standard catalog (State's Exhibit No. 1) in placing their plumbing equipment order with Mr. Meffert; instead, they looked at other catalogs in reaching their color scheme decisions. We regard this evidence as an affirmative indication of the defendant Jones' innocence in this entire affair.
Moreover, it is equally undisputed that no gold-plated plumbing fittings or fixtures were at any time ordered or discussed by the defendant Jones or his wife for the Naples vacation home in all their conferences with Mr. Meffert; Barnes' order, on the other hand, included several gold-plated plumbing fittings. We regard this difference disclosed by the evidence as particularly significant, inasmuch as the gold-plated fittings represent a highly distinctive feature in the Barnes school board purchase order  the basis, in fact, for the cancellation of the order by responsible school board officials. Yet under the evidence presented, this distinctive plumbing equipment was never planned, ordered, or even discussed for Jones' Naples vacation home. We consider this evidence as another affirmative indication of the defendant Jones' innocence in this case.
It should be noted that the architectural plans for the defendant Jones' vacation home, like most such plans, are entirely silent as to the specific plumbing equipment required in the house with respect to the brand name, color, dimensions, and material composition; these matters were left entirely to the discretion of the Joneses in consultation with their contractor, Mr. Meffert. Contrary to the state's contention, then, these general plans in no way call for the highly specific plumbing equipment [mostly American Standard brand] ordered by Barnes for his high school plumbing class. Moreover, the Joneses did not even discuss, much less order, American Standard plumbing equipment in their conferences with Mr. Meffert; indeed, they discussed plumbing brands other than American Standard, to wit: Eljer, Collier, and Kohler.
Much is made of the fact that the Joneses asked Mr. Meffert to obtain a triple-bowl, stainless steel sink for the kitchen and a six-foot tub for the master bedroom, items which admittedly are included in Barnes' purchase order. Barnes, however, ordered an Elkay brand kitchen sink, while the Joneses discussed with Mr. Meffert a Kohler brand sink as shown in a Kohler catalog (State's Exhibit No. 18). Barnes also ordered an American Standard bathtub, while the Joneses discussed only Eljer and Kohler tubs with Mr. Meffert. The similarities in these two items, then, tend to be offset by the brand name differences between the Barnes' order form and the Joneses planned vacation home.

C
The events of January 29, 1980, we think, are also entirely consistent with the defendant Jones' asserted innocence in this case. There was no evidence adduced before the jury which showed that Barnes was going to pick up the plumbing equipment he had ordered for his class from Bond on that date, and, therefore, no evidence that Jones intended to take possession of the said equipment on that date, as urged by the state. Indeed, the evidence at trial was to the contrary. The Barnes' purchase order in question (State's Exhibit No. 3) indicated a delivery date of February 29, 1980, a month later. Barnes also had no one with him at the Bond store on January 29, 1980, to carry any of the *329 plumbing equipment out of the store, even if he had desired to, and the record reveals no evidence that he was driving a truck or other similar vehicle to accommodate such a delivery. It is, therefore, difficult to conceive, as urged, how Barnes could have carried this equipment out of the store on that day [equipment which, without dispute, weighed several tons] and then have transported the equipment that day to Naples for use in Jones' vacation home.
It is true that Barnes told Mr. Allbright, a Bond employee, that he (Barnes) did not want the store to deliver the equipment, and said, "I want to take them with me" (R.784-85). The trial court, however, instructed the jury that they could not accept that statement as being true, but could only accept it as proof that the statement was, in fact, made (R.792-93). Moreover, even by this statement, Barnes did not specifically indicate when he intended to take the equipment out of the store; plainly he could not have done it at that time, with no help and with no truck or similar vehicle, even if he had desired to do so.
As for the defendant Jones' telephone conversation with Mr. Meffert on the afternoon of January 29, 1980, indicating that "plumbing fixtures [were] coming over ... between 3:00 and 5:00 [P.M.]" to be delivered to Mr. Meffert in Naples for use in Jones' vacation home (R. 1208, 1227), there is utterly no indication in this conversation as to what type of plumbing fixtures these were, from what company or store the fixtures had been acquired, or from what city the fixtures were being delivered. There is also no evidence, as previously indicated, that on that date Barnes was going to pick up the plumbing equipment he had ordered from the Bond store in Miami, so that it could not be reasonably inferred that Jones was referring to Barnes' order, in any event. Moreover, the defendant Jones indicated that "the man that is going to be bringing them [the plumbing fixtures] ... has only been over her [Naples] once, and will have to find the way" (R. 1208). Barnes had, in fact, been to Mr. Meffert's Naples office on at least two occasions, which lends further support to the contention that Jones could not, as urged, have been referring to Barnes at all in this conversation.
It is also reasonable, based on other evidence, that the defendant Jones was referring to plumbing equipment having nothing to do with the equipment ordered by Barnes. Jones had previously insisted on getting, and in fact got, a price list from Mr. Meffert which the plumbing sub-contractor had used in bidding the plumbing equipment on the vacation home. Jones wanted the list, he said, in order to compare it against the prices for plumbing equipment he could personally obtain on his own, so as to determine whether to purchase lower-priced plumbing items than that stated on the sub-contractor's list and thus obtain a credit therefor. Obviously, such a list would have been unnecessary at that time had he, as urged, planned to steal the plumbing equipment from Barnes' purchase order since, in that event, he would not be pricing plumbing equipment at all, but stealing it, and would have no use for such a list in order to accomplish the theft. The fact that Jones wanted the list for price comparison purposes lends credence to his contention that he was referring in this conversation to plumbing equipment he had previously priced and which had nothing to do with Barnes' high school order.
In addition, the evidence is extremely vague as to whether the defendant Jones was even aware that Barnes was going to the Bond store on that day, or of the subsequent cancellation of the order on that day as well. Messages of a sketchy and confusing variety were shuttled that day between Mr. Kerr, Dr. Paskel, and the defendant Jones' office, concerning the cancellation of the order. It is true that Mrs. Jones telephoned Mr. Meffert in the evening and told him not to wait anymore, that the plumbing equipment was not coming, and that the defendant Jones had just learned of this from a misplaced office message; but again, the trial court instructed the jury that they could not accept Mrs. Jones' statement as being true, but could only accept the testimony as proof *330 that the statements were, in fact, made by Mrs. Jones (R. 1225). This only adds to the confusion which the record already reveals on this subject.

D
Finally, the other claimed indications of guilt in this case are entirely consistent with the defendant Jones' innocence. The defendant Jones did accompany Barnes in looking at plumbing equipment at the Bond store in Miami prior to the submission of the request for the high school plumbing equipment. On this occasion, however, the defendant Jones clearly stated to Barnes that he (Barnes), and he alone, would make the final decision as to what equipment would be needed for the high school plumbing class. The defendant Jones in no way indicated that the equipment in question would be used for some other purpose not stated.
The defendant Jones also displayed a great deal of interest in Barnes' proposed plumbing class and in implementing the purchase order, as shown by his trip to the Bond store with Barnes and by his telephone calls to Dr. Paskel. This is explained, however, by the undisputed testimony of school board witnesses that the defendant Jones had always displayed a keen interest in alternative high schools, such as MacArthur South, and in vocational training courses offered by such schools to help disadvantaged youth.
As a corollary, Barnes, it is urged, also showed considerable interest in the defendant Jones' Naples vacation home by accompanying Jones to two conferences with Mr. Meffert in Naples. This is explained, however, by the close personal relationship between the two men which this record, without dispute, reveals.
It is also true that Mrs. Jones gave Mr. Meffert a Bond brochure, and asked Mr. Meffert to contact the Bond store in Miami to price some cheaper plumbing equipment than that bid by the plumbing sub-contractor. This brochure, however, was a Kohler Plumbing Company catalog (State's Exhibit No. 18), not the American Standard catalog (State's Exhibit No. 1) which Barnes used in placing his aforesaid school board order, and was, therefore, unconnected with the Barnes' school purchase order. In addition, it would be entirely senseless for the defendant Jones to request Mr. Meffert to do pricing at the Bond store in Miami if, as urged, he intended to steal the equipment in any event. The above request for Bond pricing, then, tends to support the defendant Jones' asserted innocence, rather than point toward his guilt. Also, Mrs. Jones' effort later to retrieve the Kohler catalog and assorted sketches from Mr. Meffert was entirely explainable as a wife's understandable effort to shield her husband from media attacks which were, at that time, transpiring.
We equally have no difficulty in accounting for the defendant Jones' efforts in early February, 1980, to get Mr. Meffert to change some of the plumbing equipment called for by the architectural plans on the vacation home. The defendant Jones' telephone calls to Mr. Meffert on this matter are entirely consistent with a public official seeking to avoid, perhaps in a misguided way, what he perceived to be an unjustified attack on his honesty by an alleged overzealous press. At this point, the media, including The Miami Herald and Channel 10 News, was pressing the defendant Jones to explain his conduct in this affair, and were, in Jones' view, unjustifiably questioning his integrity. He sought by these changes to protect himself from these alleged unfounded charges and explicitly so stated his intentions in his conversations with Mr. Meffert. These conversations are therefore entirely consistent with Jones' asserted innocence.

E
We search in vain, then, through all the state's complex proofs presented below for a single piece, or a combined set, of so-called "smoking gun" circumstantial evidence which might, even arguably, clinch the state's case against the defendant. None exists. At best, the elaborate and detailed circumstances presented by the *331 state show only a suspicious indication of guilt. After an exhaustive consideration of all the evidence in the case, after resolving all conflicts in the evidence and all reasonable inferences therefrom in favor of the state, a reasonable hypothesis of innocence, as stated above, remains intact as a matter of law, due to (1) certain deficiencies or gaps in the state's case as detailed above, and (2) certain above-stated affirmative indications of innocence not negated by the state's proofs. No jury, we think, could reasonably reach any different conclusion; indeed, the defendant's hypothesis of innocence seems at least as reasonable as the state's proffered hypothesis of guilt. Under the established law of Florida, the defendant was entitled to the entry of a judgment of acquittal in his favor at trial, and the ensuing conviction and sentence must be reversed for insufficient evidence.
It is unnecessary for us to reach the other contentions raised by the defendant on this appeal, in view of our disposition of the controlling issue herein. The criminal conviction and sentence under review is, therefore, reversed and the defendant is discharged from the cause.
Reversed and defendant discharged.
NOTES
[*] JORGENSON, J., did not participate.
[1] The fifth district has employed the en banc procedure in similar situations (but without oral argument en banc) in Edge v. State, 455 So.2d 626 (Fla. 5th DCA 1984) and Royal v. State, 452 So.2d 1098 (Fla. 5th DCA 1984).
[2] appellate courts of this State have held repeatedly that to sustain conviction in circumstantial evidence cases the inferences reasonably to be drawn from the evidence must not only be consistent with guilt of the accused but inconsistent with every reasonable hypothesis of his innocence. However, in such cases the test to be applied on motion for judgment of acquittal and on review of the denial of such a motion is not simply whether in the opinion of the trial judge or of the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt, but rather whether the jury must reasonably so conclude.
305 So.2d at 211.
[3] proper test on appeal of a denial of a motion for judgment of acquittal is whether the jury as the trier of fact might reasonably conclude that the evidence excluded every reasonable hypothesis but that of guilt. All facts introduced into evidence are admitted by the defendant, and the court must draw every conclusion favorable to the state. The motion should not be granted unless there is no legally sufficient evidence on which to base a verdict of guilt. [citations omitted]
392 So.2d at 338-39.
[4] appellant's second point, we conclude that the motion for judgment of acquittal was properly denied. The standard of review for the denial of a motion for judgment of acquittal is "not simply whether in the opinion of the trial judge or of the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt, but rather whether the jury must reasonably so conclude." By the motion, a defendant admits all facts introduced into evidence and the court must draw every inference favorable to the prosecution. The motion should not be granted absent any evidence legally sufficient upon which to base a verdict of guilt. [citations omitted]
395 So.2d at 1177.
[1] The venue on Barnes' case was changed to Palm Beach County where he was tried and convicted as charged, based on an evidentiary showing which is not disclosed by this record. The Fourth District Court of Appeal affirmed without opinion. Barnes v. State, 424 So.2d 775 (Fla. 4th DCA 1983).
[2] The defendant Jones presented 25 defense witnesses and numerous physical exhibits at the trial of this cause. He also attempted to impeach the state's witnesses through cross-examination, particularly with prior inconsistent statements against the state's chief witness, Craig Meffert. All of this defense evidence tended to discredit the state's case, to contradict the facts as established in the state's case, and to show that the defendant Jones had an excellent reputation for honesty in the community. We are, of course, required to disregard all of this evidence in determining whether the trial court erred in denying timely defense motions for a judgment of acquittal at trial; accordingly, none of this evidence appears in the factual account which follows. The facts as detailed in this opinion view the evidence presented below in a light most favorable to the state as required by law. Lynch v. State, 293 So.2d 44, 45 (Fla. 1974).
[3] The state's witness, Aldo Delgado, testified that he was not certain which date it was; he stated he felt "more inclined" toward January 5, 1980, but "I truthfully can't pin it down" (R. 637-38).
[4] The trial court instructed the jury that any statements made by Barnes to Ms. Blackstock during this telephone conversation were "not being offered for the truth of the matter contained therein, but merely for the fact that these statements were allegedly uttered" (R. 694). The jury, therefore, could not accept Barnes' statements to Ms. Blackstock as being truthful, but could only consider them as proof that the statements were in fact made.
[5] The colors listed below, except for green and avocado, come from the color listings pictured on the inside back cover of the American Standard catalog (State's Exhibit No. 1). This catalog lists and pictures the following American Standard brand name colors: gold, bayberry, bone, regency blue, fawn beige, aegean mist, bermuda coral, saffron yellow, dresden blue, american brown, colonial blue, tangerine red, and marble china.
[6] This plumbing item is pictured on page 21 of the American Standard catalog (State's Exhibit No. 1). It is a cast iron bathroom tub which is six feet long and has two chrome handles on the interior of the tub. The Bond pricing clerk, Bonnie Blackstock, described this item as one foot longer than the ordinary tub (R. 699).
[7] Although the order number is off by one digit, this plumbing item is pictured on page 22 of the American Standard catalog (State's Exhibit No. 1). It is a woman's bidet with a wall-mounted fitting.
[8] This plumbing item is not listed in the American Standard catalog (State's Exhibit No. 1). The record is silent as to what catalog this item came from  although the Bond pricing clerk, Bonnie Blackstock, apparently priced the item for Barnes and described it as a "one piece water closet" which was "not the top of the line" but more "like the second or third down" (R. 713, 729).
[9] Although the order number omits the last three digits, this plumbing item is apparently the one pictured on page 21 of the American Standard catalog (State's Exhibit No. 1). It is a low-set toilet with a "vent-away" feature which pulls stale air out and draws fresh air into the bowl when the toilet flushes (R. 729). The Bond pricing clerk, Bonnie Blackstock, testified that this was the most expensive toilet that American Standard makes  with the seat priced at $75, compared to a price of $5-$10 on a regular toilet seat (R. 707).
[10] Although the order number omits the last three digits, this plumbing item is apparently the one pictured on page 20 of the American Standard catalog (State's Exhibit No. 1). It is a five-foot long, cast iron bathtub with a pop-up drain.
[11] This plumbing item is not listed in the American Standard catalog (State's Exhibit No. 1). The record is silent as to what catalog this item came from  although the Bond pricing clerk, Bonnie Blackstock, testified that Barnes did price this item during his telephone conversation with her. Ms. Blackstock described the item as a top-of-the-line, triple bowl, stainless steel sink with two pop-up drains and fittings; she also stated that Elkay was the manufacturer (R. 707-08).
[12] This plumbing item is pictured on page 25 of the American Standard catalog (State's Exhibit No. 1). It is a small bathroom sink.
[13] This plumbing item is pictured on page 24 of the American Standard catalog (State's Exhibit No. 1). It is a small bathroom sink advertised as being made of "vitreous china" and having a "gently sculptured edge." The Bond pricing clerk, Bonnie Blackstock, testified that American Standard had only recently come out with this item (R. 709).
[14] This plumbing item is pictured on page 24 of the American Standard catalog (State's Exhibit No. 1). It is a small bathroom sink advertised as being made of "vitreous china."
[15] This plumbing item is pictured on page 22 of the American Standard catalog (State's Exhibit No. 1). It is an "elongated" bathroom toilet with a "close-coupled" tank apparently designed to use a minimum amount of water upon flushing.
[16] This plumbing item is pictured on page 24 of the American Standard catalog (State's Exhibit No. 1). It is a bathroom sink faucet with two crystalline hot and cold water handles.
[17] This plumbing item is pictured on page 26 of the American Standard catalog (State's Exhibit No. 1). It is a 24-karat, gold-plated bathroom sink faucet with two crystalline hot and cold water faucet handles.
[18] This plumbing item is pictured on page 26 of the American Standard catalog (State's Exhibit No. 1). It is a 24-karat, gold-plated bathroom shower faucet with two crystalline hot and cold water faucet handles.
[19] Although the name of this plumbing item is misspelled on the order form, it is pictured on page 26 of the American Standard catalog under the name "Stereo gold showerhead" (State's Exhibit No. 1). Bond's pricing clerk, Bonnie Blackstock, apparently priced this item for Barnes during her telephone conversation with him (R. 710-11) and described the item as one which fits on the side of the showerhead and regulates the speed of the water flow through the showerhead (R. 731). This item was also 24-karat gold plated.
[20] This plumbing item is a 24-karat, gold-plated "diverter bath spout," located on the top of a bathtub faucet, which diverts the flow of water between the faucet and the showerhead (R. 731). It is pictured on page 26 of the American Standard catalog (State's Exhibit No. 1).
[21] This plumbing item is pictured on page 26 of the American Standard catalog (State's Exhibit No. 1). It is a 24-karat, gold-plated shower-arm which connects to a showerhead (a separate item) in a bathroom shower. The Bond pricing clerk, Bonnie Blackstock, testified that "this is the part that you need to hook the shower head up to" (R. 731).
[22] This plumbing item is pictured on page 28 of the American Standard catalog (State's Exhibit No. 1). It is a series of bathroom shower fittings: a chrome-plated faucet with diverter handle, a chrome-plated showerhead and arm, and two crystalline hot and cold water faucet handles.
[23] This plumbing item is pictured on page 27 of the American Standard catalog (State's Exhibit No. 1). It is a chrome-plated bathroom faucet with two crystalline hot and cold water faucet handles.
[24] This plumbing item is pictured on page 26 of the American Standard catalog (State's Exhibit No. 1). This is a 24-karat, gold-plated bathroom faucet with two crystalline hot and cold water faucet handles.
[25] This plumbing item is not listed in the American Standard catalog (State's Exhibit No. 1). The record is silent as to what catalog this item came from  although Bond's pricing clerk, Bonnie Blackstock, apparently priced this item for Barnes during her telephone conversation with him (R. 712). She described the item as a "bar faucet" with a "goose neck swing spout" that is attached to a sink or bar sink (R. 712).
[26] This plumbing item is not listed in the American Standard catalog (State's Exhibit No. 1). The record is silent as to what catalog this item came from  although Bond's pricing clerk, Bonnie Blackstock, apparently priced a similar item for Barnes during her telephone conversation with him (R. 712-13, 733). The item priced  but not necessarily the item appearing on the order form  was a portable whirlpool which "almost snaps on the side of any tub" (R. 712) and was rated "the best" in quality when compared to other similar products (R. 714).
[27] This plumbing item is not listed in the American Standard catalog (State's Exhibit No. 1). It came from a "Delex" catalog which Barnes had when he priced some Delex items at Bond (R. 773-76). It was made by "Delta" and is apparently a bathroom sink with a "sculptured spout" and two hot and cold water handles (R. 732-33). As a Delex product, it was apparently in "an antique brass line" (R. 774) and had an "antique brass finish" (R. 733).
[28] This plumbing item is not listed in the American Standard catalog (State's Exhibit No. 1). It came from a "Delex" catalog which Barnes had when he priced some Delex items at Bond (R. 773-76). It was made by "Delta" and is apparently a tub and shower faucet with an "antique brass finish" (R. 733, 744).
[29] The trial court instructed the jury that any testimony concerning Barnes' statements to Dr. Paskel "is not being offered for the truth of the matter contained therein, but merely for the fact that it was uttered" (R. 963). The jury could not, therefore, accept any of Barnes' statements made in this and subsequent conversations as being true, but could only accept them as proof that the statements were, in fact, made.
[30] The trial court instructed the jury that Barnes' statements to Mr. Kerr were admitted "solely for the purpose that they were uttered, not for ... their truthfulness" (R. 888). The jury could not, therefore, accept Barnes' statements to Mr. Kerr as being truthful, but could only accept them as proof that the statements were, in fact, made.
[31] The trial court instructed the jury that any statements made by Barnes during this conversation with Mr. Allbright "were coming in merely for the fact that they were uttered and not for the truthfulness" (R. 792-93). The jury could not, therefore, accept any of the statements made by Barnes as being true, but could only accept them as proof that they were, in fact, uttered.
[32] Mr. Kerr testified at trial: "I called Dr. Paskel's office to inform him that I had stopped the purchase of some plumbing that " (R. 886). This is the full extent of the testimony below on this subject. Dr. Paskel was subsequently precluded by the trial court from testifying as to the nature of this conversation (R. 980-81).
[33] The trial court had previously instructed the jury that Barnes' statements to Dr. Paskel could not be accepted for the truth of the matters asserted therein, but only as proof that the statements were, in fact, made (R. 963).
[34] The trial court had previously instructed the jury that Barnes' statements could not be accepted as being true, but were offered solely to prove that the statements were, in fact, made (R. 888).
[35] The co-defendant Solomon Barnes had been to Mr. Meffert's office near Naples on two occasions when the Joneses met with Mr. Meffert on December 22, 1979, and January 15, 1980.
[36] The trial court admitted Mrs. Jones' statements made during this and subsequent telephone conversations with Mr. Meffert "as an operative fact" (R. 1225) and instructed the jury that "these conversations ... are not coming in for their truthfulness, but [for] the fact that they were uttered, as operative facts, facts going in the cause" (R. 1225). It is, therefore, clear that none of the statements made by Mrs. Jones during this and subsequent conversations with Mr. Meffert could be considered by the jury as proof of the truth of matters uttered therein, but could only be accepted as proof that the statements were, in fact, made.
[37] Williams v. State, 143 So.2d 484 (Fla. 1962) (sole evidence linking defendant to a holdup-murder was that the defendant bought the murder weapon in a pawn transaction some 2 1/2 years prior to the murder, which weapon was also used in a subsequent holdup-shooting about a month after the charged murder; murder conviction reversed); Horton v. State 91 So.2d 304 (Fla. 1956) (evidence linking defendant to store shoplifting incident deemed insufficient to link defendant to the crime charged; larceny conviction reversed); Smoak v. State, 87 So.2d 513 (Fla. 1956) (evidence linking defendant to the grand larceny of cash in a private apartment deemed insufficient to link defendant to the theft; larceny conviction reversed); Harris v. State, 53 So.2d 827 (Fla. 1951) (state's evidence linking defendant to an arson deemed insufficient arson conviction reversed); Martinez v. State 53 So.2d 640 (Fla. 1951) (evidence deemed insufficient to link defendant to the unlawful possession of lottery tickets found in automobile in which defendant was not riding; convictions for possession of lottery tickets and operating a lottery reversed); Stewart v. State, 158 Fla. 753, 30 So.2d 489 (1947) (state's evidence deemed insufficient to link the defendant to the murder for which he was charged; murder conviction reversed); Benton v. State, 127 Fla. 206, 172 So. 858 (1937) (state's evidence linking defendant to a hit-and-run automobile accident by way of a license tag number and other proofs deemed insufficient; manslaughter conviction reversed); Brown v. State, 126 Fla. 429, 171 So. 211 (1936) (state's evidence deemed insufficient to sustain an arson conviction); Frank v. State, 121 Fla. 53, 163 So. 223 (1935) (state's evidence linking defendant to a murder in a love triangle affair deemed insufficient; murder conviction reversed); Lee v. State, 96 Fla. 59, 117 So. 699 (1928) (state's evidence deemed insufficient to link the defendant to a prison convict murder; manslaughter conviction reversed); Hall v. State, 90 Fla. 719, 107 So. 246 (1925) (state's evidence deemed insufficient to link defendant to an arson; arson conviction reversed); Pate v. State, 72 Fla. 97, 72 So. 517 (1916) (state's evidence deemed insufficient to establish ownership of heifer or to link defendant to the theft and butchering of heifer; larceny conviction reversed);J.K. v. State, 448 So.2d 71 (Fla. 3d DCA 1984) (state's evidence linking juvenile to a school burglary and theft deemed insufficient; delinquency adjudication based on burglary and theft findings reversed); C.M. v. State, 434 So.2d 5 (Fla. 2d DCA 1983) (state's evidence deemed insufficient to link juvenile to a shoplifting or to exclude a viable theory of innocence; delinquency adjudication based on a theft finding reversed); Owen v. State, 432 So.2d 579 (Fla. 2d DCA 1983) (state's evidence deemed insufficient to link defendant to a burglary; burglary conviction reversed); Cox v. State, 394 So.2d 237 (Fla. 1st DCA 1981) (state's evidence deemed insufficient to link the defendant to store holdup; robbery conviction reversed); J.C. v. State, 377 So.2d 731 (Fla. 3d DCA 1979) (state's evidence including fingerprints deemed insufficient to link juvenile to a break-in; delinquency adjudication based on burglary and theft findings reversed); Jenkins v. State, 342 So.2d 1097 (Fla. 1st DCA 1977) (state's evidence deemed insufficient to link defendant to the theft of a social security check; grand larceny conviction reversed); B.S. v. State, 320 So.2d 459 (Fla. 3d DCA 1975) (state's evidence deemed insufficient to link one of the juveniles to a burglary and larceny and two of the juveniles to a burglary; delinquency adjudications based on findings as to these offenses reversed), A.V.P. v. State, 307 So.2d 468 (Fla. 1st DCA 1975) (state's evidence deemed insufficient to link defendant to an arson based on fingerprint proofs; delinquency adjudication based on an arson finding reversed), Thompson v. State, 276 So.2d 218 (Fla. 4th DCA), cert. denied, 281 So.2d 210 (Fla. 1973) (state's evidence deemed insufficient to link defendant to the murder of her husband, murder conviction reversed); Whitehead v. State, 273 So.2d 146 (Fla. 2d DCA 1973) (state's evidence deemed insufficient to link defendant to a holdup-murder at which the defendant was present; first degree murder conviction reversed); Camporeale v. State, 270 So.2d 49 (Fla. 4th DCA 1973) (state's evidence deemed insufficient to link defendant to a murder; murder conviction reversed) J.D.D. v. State, 268 So.2d 457 (Fla. 4th DCA 1972) (state's evidence deemed insufficient to link juveniles to theft of purse from clerk in store; delinquency adjudication reversed); Gayle v. State, 258 So.2d 455 (Fla. 1st DCA 1972) (state's evidence deemed insufficient to link defendant to a burglary; burglary conviction reversed); Terzado v. State, 232 So.2d 232 (Fla. 4th DCA 1970) (state's evidence deemed insufficient to link defendant to a criminal homicide, second degree murder conviction reversed); Wilkerson v. State, 232 So.2d 217 (Fla. 2d DCA 1970) (state's evidence, including fingerprint evidence, deemed insufficient to link defendant to burglary, burglary conviction reversed); Rhoden v. State, 227 So.2d 349 (Fla. 1st DCA 1969) (state's evidence, including fingerprint evidence, deemed insufficient to link defendant to a break-in of a garage apartment and the theft of furniture therein; burglary and larceny convictions reversed); Garcia v. State, 227 So.2d 209 (Fla. 2d DCA 1969) (state's evidence deemed insufficient to link defendant to a car break-in; car burglary conviction reversed); Smith v. State, 194 So.2d 310 (Fla. 1st DCA 1966) (state's evidence deemed insufficient to link defendant to a housebreaking; burglary and larceny convictions reversed); Reynolds v. State, 186 So.2d 315 (Fla. 3d DCA 1966) (state's evidence deemed insufficient to link defendant to the theft of a truck; larceny conviction reversed); Holley v. State, 179 So.2d 577 (Fla. 1st DCA 1965) (state's evidence deemed insufficient to link defendant to a burglary; burglary conviction reversed); Pacetti v. State, 157 So.2d 445 (Fla. 2d DCA 1963) (state's evidence deemed insufficient to link defendant to murder in lovetriangle affair; murder conviction reversed); Guarino v. State, 133 So.2d 596 (Fla. 2d DCA 1961) (state's evidence deemed insufficient to link defendant to the burglary of a house; burglary conviction reversed); Herring v. State, 121 So.2d 807 (Fla. 3d DCA 1960) (state's evidence deemed insufficient to link defendant to the break-in of a car based solely on defendant's presence in get-away car; burglary of auto conviction reversed), Harrison v. State, 104 So.2d 391 (Fla. 1st DCA 1958) (state's evidence deemed insufficient to link defendant to theft of money taken from his uncle's room; grand larceny conviction reversed).
[38] Hall v. State, 403 So.2d 1319 (Fla. 1981) (state's evidence deemed insufficient to establish the element of premeditation in a first degree murder case, conviction for first degree murder reversed and reduced to second degree murder); McGough v. State, 302 So.2d 751 (Fla. 1974) (state's evidence deemed insufficient to establish that defendant had knowledge and criminal intent of a "kickback" scheme in an automobile agency whereby the defendant received discounts on purchased automobiles; larceny convictions reversed); Jenkins v. State, 120 Fla. 26, 161 So. 840 (1935) (state's evidence deemed insufficient to establish element of premeditation in a first degree murder case; conviction for first degree murder reversed); Gustine v. State, 86 Fla. 24, 97 So. 207 (1923) (state's evidence deemed insufficient to establish that defendant had a criminal intent to steal an automobile; attempted auto theft conviction reversed); Tien Wang v. State, 426 So.2d 1004 (Fla. 3d DCA), pet. for review denied, 434 So.2d 889 (Fla. 1983) (state's evidence deemed insufficient to establish the element of premeditation in a first degree murder case; first degree murder conviction reversed and conviction reduced to second degree murder); Davis v. State, 424 So.2d 875 (Fla. 1st DCA 1982), pet. for review denied, 434 So.2d 889 (Fla. 1983) (state's evidence deemed insufficient to establish a criminal intent from the defendant's actions as a city manager in accounting for reimbursed expenses at a Florida League of Cities convention; theft conviction reversed); Mishmash v. State, 423 So.2d 446 (Fla. 1st DCA 1982), pet. for review denied, 434 So.2d 889 (Fla. 1983), cert. denied, ___ U.S. ___, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984) (state's evidence deemed insufficient to establish guilty knowledge against the defendant in a possession of marijuana case; possession of marijuana conviction reversed); Gains v. State, 417 So.2d 719 (Fla. 1st DCA 1982), pet. for review denied, 426 So.2d 26 (Fla. 1983) (state's evidence deemed insufficient to establish that the defendant aided and abetted his companions with criminal intent in an armed robbery; robbery conviction reversed); A.Y.C. v. State, 414 So.2d 1158 (Fla. 3d DCA 1982) (state's evidence deemed insufficient to establish that juvenile as the driver of the get-away car had any prior knowledge that a burglary was going to be committed by his companions, and, thus the element of criminal intent as an aider and abetter was not shown; delinquency adjudication based on a burglary finding reversed); Thomson v. State, 398 So.2d 514 (Fla. 2d DCA 1981) (state's evidence deemed insufficient to establish requisite criminal intent for a contempt conviction; contempt conviction reversed); J.O. v. State, 384 So.2d 966 (Fla. 3d DCA 1980) (state's evidence deemed insufficient to establish a criminal intent by the juveniles to participate in an attempted purse snatch; delinquency adjudication based on attempted robbery finding reversed); Gellman v. State, 371 So.2d 181 (Fla. 3d DCA 1979) (state's evidence deemed insufficient to establish the element of felonious intent in an auto theft case; auto theft convictions reversed); Falin v. State, 367 So.2d 675 (Fla. 3d DCA 1979) (state's evidence deemed insufficient to establish possession or guilty knowledge in an unlawful possession of drugs case; conviction for possession of contraband drugs reversed); K.W.U v. State, 367 So.2d 647 (Fla. 3d DCA), cert. denied, 378 So.2d 349 (Fla. 1979) (state's evidence deemed insufficient to establish criminal intent by juvenile to participate in crime as aider and abetter, circumstantial evidence rule held applicable; delinquency adjudication reversed); Clark v. State, 359 So.2d 458 (Fla. 3d DCA 1978), cert. denied, 366 So.2d 880 (Fla. 1979) (state's evidence deemed insufficient to establish guilty knowledge in a possession of marijuana case involving marijuana which was jointly possessed by the defendant and his wife; possession of marijuana conviction reversed); Morgan v. State, 355 So.2d 149 (Fla. 1st DCA), cert. denied, 361 So.2d 835 (Fla. 1978) (state's evidence deemed insufficient to establish criminal intent so as to make defendant an aider and abetter in an attempted break-in of a warehouse; attempted burglary conviction reversed); D.J. v. State, 330 So.2d 35 (Fla. 4th DCA 1976) (state's evidence deemed insufficient to establish guilty knowledge of the presence of certain marijuana taken from car jointly occupied by juvenile and others; delinquency adjudication based on a finding of marijuana possession reversed); Hilding v. State, 291 So.2d 111 (Fla. 4th DCA), cert. denied, 296 So.2d 51 (Fla. 1974) (state's evidence insufficient to establish that defendant had guilty knowledge that his wife had just received a package of cocaine in the mail; conviction for unlawful possession of cocaine reversed); McGuire v. State, 288 So.2d 271 (Fla. 4th DCA 1974) (state's evidence deemed insufficient to establish that she knew her son was stealing a lawnmower when she drove him to a church and he took the lawnmower in question from a shed; burglary and larceny convictions reversed); Weinstein v. State, 269 So.2d 70 (Fla. 1st DCA 1972), cert. denied, 273 So.2d 764 (Fla. 1973) (state's evidence deemed insufficient to establish that the shot defendant fired into a van killing the victim was done so deliberately with intent to kill; manslaughter conviction reversed), J.D.D. v. State, 268 So.2d 457 (Fla. 4th DCA 1972) (state's evidence deemed insufficient to establish guilty knowledge and possession in an unlawful possession of marijuana case; delinquency adjudication reversed) Lockett v. State, 262 So.2d 253 (Fla. 4th DCA 1972) (state's evidence deemed sufficient to negate defendant's alibi, but insufficient to establish that defendant had a criminal intent to participate as an aider and abetter in his companion's burglary; burglary conviction reversed); Douglas v. State, 214 So.2d 653 (Fla. 3d DCA 1968) (state's evidence deemed insufficient to establish defendant's guilty knowledge as an aider and abetter of his companion's activity; burglary and robbery conviction reversed); Allen v. State, 124 So.2d 741 (Fla. 1st DCA 1960) (state's evidence deemed insufficient to establish that when defendant assaulted victim he did so with an intent to murder the victim; conviction for assault with intent to commit murder reversed).
[39] Head v. State, 62 So.2d 41 (Fla. 1952) (evidence deemed insufficient to establish that deceased died in an automobile accident and that defendant caused the accident; vehicular manslaughter conviction reversed); Solomon v. State, 115 Fla. 310, 156 So. 401 (1934) (state's evidence deemed insufficient to establish that defendant was maintaining and operating a gambling room; gambling conviction reversed); Sanders v. State, 344 So.2d 876 (Fla. 4th DCA 1977) (state's evidence deemed insufficient to establish that defendant pickpocketed the victim; robbery conviction reversed); Atkins v. State, 301 So.2d 459 (Fla. 4th DCA 1974) (state's evidence deemed insufficient to exclude hypothesis that defendant's companion placed bag of marijuana under car in which defendant and companion were riding; conviction for unlawful possession of marijuana reversed), Gallagher v. State 291 So.2d 252 (Fla. 4th DCA 1974) (state's evidence deemed insufficient to establish a delivery of marijuana; delivery of marijuana conviction reversed); Spina v. State, 203 So.2d 20 (Fla. 3d DCA 1967) (state's evidence deemed insufficient to establish that defendant owned or controlled a room where, admittedly, gambling was taking place; convictions for bookmaking and operating a gambling room reversed); Maples v. State, 183 So.2d 736 (Fla. 3d DCA 1966) (state's evidence deemed insufficient to establish that assault victim's wallet was stolen during attack by defendants; robbery conviction reversed); Knowles v. State, 183 So.2d 597 (Fla. 1st DCA 1966) (state's evidence deemed insufficient to exclude reasonable hypothesis that defendant's baby (the victim) was injured while defendant was not with her; assault with intent to rape conviction reversed); Witherspoon v. State, 169 So.2d 854 (Fla. 3d DCA 1964) (state's evidence deemed insufficient to establish that defendant's phone calls near a race track disseminated race track results; conviction for unlawful dissemination of race track results reversed); Adams v. State, 102 So.2d 47 (Fla. 1st DCA 1958) (state's evidence deemed insufficient to identify which scrap iron the defendant sold to a junk dealer, although stolen scrap iron was found in junk dealer's possession; grand larceny conviction reversed).
[40] Jaramillo v. State, 417 So.2d 257 (Fla. 1982) (defendant's trial testimony explaining the presence of his fingerprints on certain items in the murder victim's home not properly negated by state's proof; murder conviction based on the aforesaid fingerprint evidence reversed), McArthur v. State, 351 So.2d 972 (Fla. 1977), writ of prohibition denied sub nom., McArthur v. Nourse, 358 So.2d 132 (Fla.) vacated and remanded, 438 U.S. 902, 98 S.Ct 3119, 57 L.Ed.2d 1145 (1978), on remand, 369 So.2d 578 (Fla. 1979) (defendant's statements to the police indicated that the defendant shot and killed her husband in a non-negligent accident; state's evidence did not properly negate this version of the homicide; murder conviction reversed), Driggers v. State, 164 So.2d 200 (Fla. 1964) (defendant's trial testimony, indicating that his wife killed herself by falling from a railroad trestle into a river below, was not properly negated by the state's proof; murder conviction reversed); Davis v. State, 90 So.2d 629 (Fla. 1956) (defendant's explanation for sudden disappearance of wife, related to various witnesses, not properly negated by state's proof; conviction for murder of defendant's wife reversed); Mayo v. State, 71 So.2d 899 (Fla. 1954) (defendant's version of homicide that he killed the deceased in self-defense not properly negated by the state's proof; murder conviction reversed); Ingram v. State, 144 Fla. 714, 198 So. 464 (1940) (defendant's corroborated alibi evidence not negated by state's proof; manslaughter conviction reversed); Free v. State, 142 Fla. 233, 194 So. 639 (1940) (defense testimony that the defendant was born of a white woman and was fathered by a white man, not negated by state's proofs; miscegenation conviction reversed), Kelly v. State, 99 Fla. 387, 126 So. 366 (1930) (defendant's trial testimony that he killed the deceased in a non-negligent accident not properly negated by state's proof; murder conviction reversed); Metrie v. State, 98 Fla. 1228, 125 So. 352 (1930) (defendant's trial testimony that he justifiably killed the deceased in a love triangle altercation not properly negated by state's proof; murder conviction reversed); Holton v. State, 87 Fla. 65, 99 So. 244 (1924) (defendant's trial testimony that he killed the deceased in self-defense not properly negated by state's proof; murder conviction reversed), Fudge v. State, 75 Fla. 441, 78 So. 510 (1918) (evidence adduced at trial that defendant's children committed suicide not properly negated by state's proofs; first degree murder conviction reversed); Thomas v. State, 356 So.2d 827 (Fla. 4th DCA 1978) (defendant's defense at trial that he thought he was acting in an undercover police role in the delivery of certain marijuana for sheriff's deputies not negated by state's proof; delivery of marijuana conviction reversed); Schilling v. State, 285 So.2d 428 (Fla. 3d DCA 1973) (defendant's trial testimony which gave an exonerating explanation for his stopping payment on two checks used to purchase stock, not properly negated by state's proofs; convictions for stopping payment on checks reversed); Ricard v. State, 181 So.2d 677 (Fla. 3d DCA 1966) (defendant's trial testimony which gave an exonerating account as to what happened to certain monies entrusted to him, not negated by state's proof, and, therefore, element of appropriation in larceny case not established; larceny conviction reversed).
[41] Broadnax v. State, 57 So.2d 651 (Fla. 1952) (defendant's statement to police that he was only working as an employee at a country beer and wine establishment and had no knowledge of "live" lottery tickets in cigar box under counter, not properly negated by state's proof; also state's proof itself insufficient to prove guilty knowledge or possession of the lottery tickets; possession of lottery tickets conviction reversed); Lyons v. State, 47 So.2d 541 (Fla. 1950) (evidence deemed insufficient to link the defendant to the shooting of a calf; defendant's trial testimony, corroborated by his wife's trial testimony, that he discovered the calf dead after another person had shot the calf and left the scene, not properly negated by state's proof; larceny conviction reversed); Savage v. State, 152 Fla. 367, 11 So.2d 778 (1943) (state's evidence deemed insufficient to establish manslaughter negligence against the defendant in an automobile accident in which he was the driver; in addition, the defendant's exonerating version of the accident and his effort to extricate the victim from the automobile thereafter, not properly negated; manslaughter conviction reversed); Parish v. State, 98 Fla. 877, 124 So. 444 (1929) (state's evidence deemed insufficient to link defendants to a burglary; defendants' trial testimony and other evidence establishing an alibi not properly negated by state's proof; burglary conviction reversed); Davis v. State, 90 Fla. 816, 107 So. 245 (1925) (state's evidence deemed insufficient to establish that defendant fired shot which killed deceased; defendant told police that he fired his gun into the ground and not at deceased; manslaughter conviction reversed); Simpson v. State, 81 Fla. 292, 87 So. 920 (1921) (state's evidence deemed insufficient to establish that defendant had a specific criminal intent to commit rape when he broke into a dwellinghouse; defendant testified he was drunk and had no recollection of incident; conviction for breaking and entering a dwellinghouse with intent to commit rape reversed); Whetston v. State, 31 Fla. 240, 12 So. 661 (1893) (state's evidence deemed insufficient to link the defendant to the arson of a cottonhouse; defendant gave exonerating testimony; arson conviction reversed); Davis v. State, 436 So.2d 196 (Fla. 4th DCA 1983), pet. for review denied, 444 So.2d 418 (Fla. 1984) (state's evidence deemed insufficient to establish that defendant with requisite criminal intent aided and abetted his companions in the commission of a holdup; defendant made statement to police that he had no knowledge that any robbery was about to take place; robbery conviction reversed); Redding v. State, 357 So.2d 483 (Fla. 3d DCA), cert. denied, 364 So.2d 892 (Fla. 1978) (state's evidence deemed insufficient to link the defendant to the theft of certain property from a room previously leased by the defendant; defendant testified at trial that he moved out of the room in question, that he left the key in the house mailbox, and did not steal any property; grand larceny conviction reversed); Harris v. State, 307 So.2d 218 (Fla. 3d DCA 1974), cert. denied, 315 So.2d 195 (Fla. 1975) (state's evidence deemed insufficient to establish possession and guilty knowledge of heroin found in car jointly occupied by defendant and a companion; defendant gave exonerating trial testimony as to his lack of knowledge of heroin in the car; possession of heroin conviction reversed); Forbes v. State, 210 So.2d 246 (Fla. 3d DCA 1968) (state's evidence deemed insufficient to establish that money orders endorsed and uttered by the defendant were false or forged documents; defendant testified that the money orders were paid to him by the persons whose names appear as the makers, forgery and uttering convictions reversed); Smith v. State, 194 So.2d 310 (Fla. 1st DCA 1966) (state's evidence deemed insufficient to link defendant to burglary; defendant told police that the stolen items of property found in his possession were purchased at several auctions; burglary convictions reversed); Day v. State, 154 So.2d 340 (Fla. 2d DCA 1963) (state's evidence deemed insufficient to establish culpable negligence and to negate defendant's exonerating version of events leading to fatal automobile accident; manslaughter conviction reversed).
[42] Heiney v. State, 447 So.2d 210 (Fla. 1984) (state's evidence deemed sufficient to link the defendant to a murder; murder conviction upheld); Williams v. State, 437 So.2d 133 (Fla. 1983) (state's evidence deemed sufficient to link the defendant to the murder of his girlfriend, establish the element of premeditation, and to negate the defendant's exonerating trial testimony; first degree murder conviction upheld); Rose v. State, 425 So.2d 521 (Fla. 1982), cert. denied, 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983) (state's evidence deemed sufficient to link the defendant to the kidnapping and premeditated murder of a child; defendant's exonerating statements to police sufficiently negated by state's evidence; murder and kidnapping convictions upheld); Peek v. State, 395 So.2d 492 (Fla. 1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981) (state's evidence deemed sufficient to link the defendant to a break-in, rape-murder, and to negate the defendant's exonerating statements to the police and trial testimony; convictions for first degree murder, sexual battery, burglary, and grand larceny upheld); Thomas v. State, 374 So.2d 508 (Fla.), cert. denied, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1979) (state's evidence deemed sufficient to link defendant to a rape-murder; first degree murder conviction upheld); Conner v. State, 106 So.2d 416 (Fla. 1958) (state's evidence deemed sufficient to link defendant to a murder and to establish the element of premeditation; first degree murder conviction upheld); Lopez v. State, 66 So.2d 807 (Fla. 1953) (state's evidence deemed sufficient to establish that defendant was conducting a bolita lottery at bar; conviction for conducting lottery upheld); Francis v. State, 58 So.2d 872 (Fla. 1952) (state's evidence deemed sufficient to link the defendant to a criminal homicide committed in a rooming house; manslaughter conviction upheld); Walker v. State, 152 Fla. 455, 13 So.2d 4 (1943) (state's evidence deemed sufficient to link defendant to the burglary of a store; burglary conviction upheld); Chason v. State, 148 Fla. 540, 4 So.2d 691 (1941) (state's evidence deemed sufficient to sustain a second degree murder conviction); Victor v. State, 141 Fla. 508, 193 So. 762 (1939) (state's evidence deemed sufficient to establish that the defendant was in possession of "live" lottery tickets; conviction for possession of lottery tickets upheld); Dewey v. State, 135 Fla. 443, 186 So. 224 (1938) (state's evidence deemed sufficient to link the defendant to the murder of his wife; defendant's statement to sheriff that his wife committed suicide was not reaffirmed as true by the defendant's trial testimony; defendant's trial testimony gave no explanation for wife's death, which, itself, was an incriminating factor; second degree murder conviction upheld); Simmons v. State, 99 Fla. 1216, 128 So. 486 (1930) (state's evidence deemed sufficient to link defendant to a criminal homicide and to negate an exonerating statement by defendant; manslaughter conviction upheld); Buchanan v. State, 97 Fla. 1059, 122 So. 704 (1929) (state's evidence deemed sufficient to negate the defendant's trial testimony that he killed the deceased in self-defense and to establish a premeditated murder; first degree murder conviction upheld); Whiting v. State, 97 Fla. 693, 122 So. 2 (1929) (state's evidence deemed sufficient to link the defendant to a store holdup as an accessory before the fact, and to negate the defendant's trial testimony corroborated by another witness as to an alibi; conviction for robbery as accessory before the fact upheld); Lowe v. State, 90 Fla. 255, 105 So. 829 (1925) (state's evidence deemed sufficient to link defendant to a murder and to establish that it was a premeditated murder; first degree murder conviction upheld), Williams v. State, 73 Fla. 1198, 75 So. 785 (1917) (state's evidence deemed sufficient to establish that defendant shot and killed the deceased, manslaughter conviction upheld); Kennedy v. State, 31 Fla. 428, 12 So. 858 (1893) (state's evidence deemed sufficient to link the defendant to the theft of certain gold coins and treasury notes; grand larceny conviction upheld); Coleman v. State, 26 Fla. 61, 7 So. 367 (1890) (state's evidence deemed sufficient to link defendant to criminal homicide and to negate defendant's claim of alibi; murder conviction upheld); Anderson v. State, 24 Fla. 139, 3 So. 884 (1888) (state's evidence deemed sufficient to establish that the deceased was killed, that the defendant aided and abetted another to murder the deceased and that defendant had a premeditated design to effect the deceased's death; first degree murder conviction upheld); Atkinson v. State, 429 So.2d 726 (Fla. 1st DCA 1983) (state's evidence deemed sufficient to link defendant to a kidnapping, robbery, rape incident and to negate defendant's alibi statement to police, which he repudiated when he testified at trial; convictions for kidnapping, robbery, sexual battery, and grand theft upheld), Riguad v. State, 404 So.2d 791 (Fla. 3d DCA 1981) (state's evidence deemed sufficient to link the defendant to a larceny and to negate a claim that a third party stole the property; grand larceny conviction upheld); M.R. v. State, 399 So.2d 56 (Fla. 3d DCA 1981) (state's evidence, including fingerprint evidence, deemed sufficient to link the juvenile to a burglary and grand theft, and to negate defendant's explanation at trial as to how his fingerprint was placed on a certain jalousie slat; delinquency adjudication based on burglary and theft findings upheld); Edwards v. State, 390 So.2d 1239 (Fla. 1st DCA 1980) (state's evidence, including bloodhound tracking, deemed sufficient to link defendant to a burglary, robbery, sexual battery; convictions therefor upheld); Zuberi v. State, 343 So.2d 664 (Fla. 3d DCA), cert. denied, 354 So.2d 988 (Fla. 1977) (state's evidence deemed sufficient to link defendant to a robbery-murder; first degree murder conviction upheld); McWhirter v. State, 325 So.2d 463 (Fla. 1st DCA), cert. denied, 336 So.2d 602 (Fla. 1976) (state's evidence deemed sufficient to sustain a receiving stolen property conviction; defendant's hypothesis of guilt for offense not charged need not be negated); B.S. v. State, 320 So.2d 459 (Fla. 3d DCA 1975) (state's evidence deemed sufficient to link two of the juveniles to the crime of receiving stolen property; delinquency adjudication based on a receiving stolen property finding upheld), Rosson v. State, 319 So.2d 64 (Fla. 2d DCA 1975) (state's evidence deemed sufficient to establish defendant as an aider and abetter in an auto burglary and to negate defendant's statement to police denying such involvement; car burglary convictions upheld); Piantadosi v. State, 311 So.2d 742 (Fla. 3d DCA 1975) (state's evidence deemed sufficient to link defendant to burglary/larceny and to negate defendant's exonerating trial testimony; burglary and larceny convictions upheld); Hernandez v. State, 305 So.2d 211 (Fla. 3d DCA 1974), cert. denied, 315 So.2d 192 (Fla. 1975) (state's evidence deemed sufficient to sustain convictions for burglary and assault with intent to commit murder); Duran v. State, 301 So.2d 486 (Fla. 3d DCA 1974) (state's evidence deemed sufficient to sustain a grand larceny conviction); State v. Perry, 297 So.2d 638 (Fla. 2d DCA 1974) (state's evidence deemed sufficient to establish that the defendant was in possession of packets containing heroin; order granting a new trial for the defendant reversed); Thomas v. State, 293 So.2d 88 (Fla. 2d DCA), cert. denied, 300 So.2d 21 (Fla. 1974) (state's evidence deemed sufficient to establish that the defendant was an aider and abetter in the murder of a child; second degree murder conviction upheld); Miller v. State, 270 So.2d 423 (Fla. 3d DCA 1972), cert. denied, 275 So.2d 16 (Fla. 1973) (state's evidence deemed sufficient to link defendant to a purse snatch; robbery conviction upheld); Navarro v. State, 262 So.2d 729 (Fla. 3d DCA 1972) (state's evidence deemed sufficient to establish that defendant shot the deceased; second degree murder conviction upheld); Hall v. State, 248 So.2d 524 (Fla. 3d DCA 1971) (state's evidence deemed sufficient to link defendant to the burglary of a store and to negate the defendant's trial testimony denying the offense; convictions for burglary and attempted grand larceny upheld); McBride v. State, 191 So.2d 70 (Fla. 1st DCA 1966) (state's evidence deemed sufficient to negate defendant's trial testimony and establish a criminal homicide; defendant's version of the homicide was consistent with guilt in any event; manslaughter conviction upheld); Rausch v. State, 159 So.2d 926 (Fla. 3d DCA), cert. denied, 166 So.2d 595 (Fla. 1964) (state's evidence deemed sufficient to link defendant to arson; arson conviction upheld); Trimble v. State, 102 So.2d 738 (Fla. 3d DCA 1958) (state's evidence deemed sufficient to establish that defendant was the driver of a car which caused the death of the deceased; defendant's statement to police did not raise a reasonable hypothesis of innocence, given all the evidence in the case; manslaughter conviction upheld).